681 A.2d 130

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Robert FISHER, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 28, 1993.

Reargued Jan. 22, 1996.

Decided June 25, 1996.

Reargument Denied Sept. 6, 1996.

234

David R. DeStefano, Joseph Hylan, Norristown, for Robert Fisher.

Bruce L. Castor, Patricia E. Coonahan, Norristown, Robert A. Graci, Office of Atty. Gen., for Com.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION OF THE COURT

ZAPPALA, Justice.

We have before us an automatic direct appeal from the judgment of sentence of death imposed upon Appellant, Robert Fisher, by the Court of Common Pleas of Montgomery County, Criminal Division.[1] For the following reasons, we affirm the conviction of murder in the first degree, but vacate the judgment of sentence of death and remand for a new sentencing hearing. The relevant facts of this case are as follows.

In the month preceding her murder, Linda Rowden, the victim in the instant matter, had been in contact with the Norristown police. Rowden had complained that her boyfriend, the Appellant, had been harassing her regarding her

1. *See* 42 Pa.C.S. §§ 722(4), 9711(h)(1); Pa.R.A.P. 702(b) and 1941.

earlier statements to the police in response to their investigation of the murder of Nigel Anderson. The police had questioned Appellant regarding the Anderson murder case.[2]

On July 10, 1980, Rowden was driving her car at a slow rate of speed on Dekalb Street, in Montgomery County. Richard Mayo was seated in the front passenger seat, and Appellant was seated in the backseat. It was daylight, and the windows of the car were down. According to eyewitnesses, Appellant leaned forward and shot the driver, Linda Rowden, twice with a revolver.

The victim slumped forward and her vehicle, uncontrolled, swerved to the right and crashed into parked cars on DeKalb Street. Appellant exited the rear door of the vehicle and walked hastily down an intersecting street with a pistol in his hand. Mayo exited the right front passenger door, yelled for help, went to an emergency telephone and called the police. Subsequent forensic tests and an autopsy performed on the victim confirmed that the victim died of the gunshot wounds.

Immediately following the shooting, Appellant went to Denise Walker's apartment. He told Walker that he had just shot the victim because she "was running her face to the detectives." [3] Appellant changed clothes, told Walker that he was

2. Appellant was charged and initially convicted in federal court of violating Anderson's civil rights. Anderson had been scheduled to testify as a government witness in a federal drug prosecution case, but was murdered before he had an opportunity to testify. Appellant's federal conviction in the Anderson murder was ultimately overturned. The subsequent reversal of the federal "Anderson" conviction served as the basis for the reversal of Appellant's state murder conviction in *Commonwealth v. Fisher*, 527 Pa. 345, 591 A.2d 710, (1991) (hereinafter *Fisher I*, the case *sub judice* shall be referred to as *Fisher II* ). Appellant's alleged involvement in the Anderson killing had been admitted into evidence during Appellant's first state court trial for the Rowden murder, *Fisher I*.

3. Prior to the instant murder, the victim had complained to police that Appellant had assaulted her and had been harassing her because of her cooperation with authorities in the investigation of the murder of Nigel Anderson. Evidence was offered which indicates that the victim wanted Appellant to be arrested and a complaint was prepared. An officer spoke to Appellant at the time the complaint was issued and told him that the victim was going to press charges and that he should stay away from her. According to Mayo, Appellant and the victim were arguing

leaving town, and fled the area shortly thereafter. A subsequent search of Walker's apartment uncovered a set of Appellant's clothes and a box of unused bullets. Six of the eight remaining bullets were found to be analytically indistinguishable from the bullets retrieved from the victim's body. Appellant was not apprehended until the fall of 1987 in New York City. Following extradition proceedings in New York, he was returned to Pennsylvania.

In 1988, Appellant was tried and convicted of first degree murder. Following his conviction, Appellant was sentenced to death. On direct appeal, this Court vacated the conviction and the matter was remanded for a new trial. Appellant was retried in August of 1991, and was convicted of first degree murder. The jury found that the aggravating circumstances outweighed the mitigating circumstances and Appellant was sentenced to death. This appeal follows.

■■■■ Although Appellant does not argue that the evidence was insufficient to convict him of murder in the first degree, under *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26–27, n. 3, 454 A.2d 937, 942, n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983), this Court is mandated to conduct an independent review of the sufficiency of the evidence and determine whether the evidence presented was sufficient to support the jury's verdict. The test for determining the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner and drawing all proper inferences favorable to the Commonwealth, the jury could have determined all elements of the crime to have been established. *Commonwealth v. Jermyn*, 516 Pa. 460, 533 A.2d 74 (1987). The evidence as described above is more than sufficient to support a first degree murder conviction. Mayo, who was seated in the front seat of the vehicle, directly beside the victim, testified that he observed Appellant shoot the victim. Several other eyewitnesses testified that they observed Appellant

in the car immediately before the shooting about the victim's cooperation with police investigating the Anderson murder.

quickly leave the crime scene carrying a revolver. Walker testified that Appellant admitted shooting the victim immediately following the event. Appellant himself evidenced his guilt by immediately fleeing the Philadelphia area. Forensic and ballistic reports corroborated all of the eyewitness testimony. A person is guilty of criminal homicide if he intentionally, knowingly, recklessly, or negligently causes the death of another human being. 18 Pa.C.S.A. § 2501(a). The Crimes Code defines murder of the first degree as "a criminal homicide ... committed by an intentional killing," i.e., a "willful, deliberate and premeditated killing." 18 Pa.C.S.A. § 2502(a) and (d). The evidence adduced at trial was clearly sufficient to support the jury's verdict of guilt of murder of the first degree.

 Appellant asserts a total of thirty separate issues for our review.[4] First, Appellant asserts that the trial judge erred in not recusing himself. Appellant argues that the trial judge was incapable of remaining objective and unbiased in light of its participation in Appellant's first conviction in *Fisher I*. This argument fails. Recusal is required whenever there is substantial doubt as to a jurist's ability to preside impartially. Code of Judicial Conduct, Canon 3, subd. C(1)(a); *Commonwealth v. Boyle*, 498 Pa. 486, 447 A.2d 250 (1982). Before the trial commenced, the trial court entered an order which clearly set forth that if Appellant chose a bench trial or entered a guilty plea, the court would recuse itself; but if

---

4. This Court encourages zealous advocacy, particularly in the context of capital appeals; it does not, however, condone unsupported and conclusory argumentation. Many of the arguments asserted in the instant appeal are presented in only the most cursory of form, and are often completely devoid of merit. However, in light of the paramount importance which this Court places upon full and detailed review of capital convictions on direct appeal, the Court has endeavored, in these instances, to the extent practical, to fully review the asserted arguments. Nonetheless, upon full and complete review of all of the arguments, the Court is satisfied that these arguments are meritless. We see no reason to set forth Appellant's arguments in any greater detail than that offered by Appellant himself and do not believe that setting forth our full analysis on each issue would result in meaningful guidance to the Bar. Accordingly, we have, in these instances, merely set forth each asserted argument and a short disposition.

Appellant demanded a jury trial, the court would not recuse itself. The court stated clearly that if a jury trial was demanded, the jury would decide all issues of fact, and that the court was able to set aside anything that was adduced at the previous trial and had no preconceived ideas concerning the second trial. Further, a reading of the trial court opinions in both *Fisher I* and *Fisher II* illustrate that the court's rulings were based on the appropriate application of legal principles and not improper personal opinion or bias of the trial judge. If a judge rules that he or she can hear and dispose of the case fairly and without prejudice, that decision will not be disturbed on appeal absent an abuse of discretion. *Commonwealth v. Frank,* 395 Pa.Super. 412, 577 A.2d 609 (1990). There was no abuse of discretion.

Next, Appellant alleges that the trial court erred by failing to dismiss the charges against Appellant under Pa.R.Crim.P., Rule 1100. Appellant points to the eight year period between July 11, 1980, when the Commonwealth filed a criminal complaint against Appellant, and July 18, 1988, when his trial commenced. However, Appellant was arrested in the Fall of 1987, in New York City where he had been hiding out since the 1980 murder.

Rule 1100(c)(3)(i) provides as follows:

"(c) In determining the period for commencement of trial, there should be excluded therefrom: (3) such period of delay at any stage of the proceedings as results from: (i) the unavailability of the defendant...."

Accordingly, under Rule 1100(c)(3)(i), that portion of the delay which can be attributed to Appellant's seven year absence from the Commonwealth is excludable. Appellant insists that the Commonwealth must show that it exercised due diligence in its efforts before it may take advantage of a Rule 1100(c) exclusion. However, the due diligence requirement "does not demand perfect vigilance and punctilious care, but rather a reasonable effort." *Commonwealth v. Polsky,* 493 Pa. 402, 407, 426 A.2d 610, 613 (1981). "Common sense, the public interest, and justice demand that a defendant not be

permitted the windfall of an absolute dismissal under Rule 1100 when he voluntarily absents himself from the jurisdiction, refuses to return, and due diligence by law enforcement authorities fails to secure his return." *Polsky* 493 Pa. at 407–08, 426 A.2d at 613. A review of the record reveals that local police authorities continued reasonable efforts to apprehend Appellant throughout his eight year absence. Local authorities submitted his name and description to a national wanted persons list, set up a stake-out upon reports that Appellant was returning to the area, followed up leads, and continued to interview witnesses, friends and families regarding the murder and Appellant's possible whereabouts. The authorities exercised due diligence, and thus, there was no error.

Next, Appellant contends that the trial court erred by refusing to suppress physical evidence discovered by police officers during a search pursuant to a warrant at Appellant's apartment immediately following the shooting. Appellant contends that the affidavit of probable cause did not support a finding of probable cause, in that Appellant's criminal "street activity", if any, did not bear a "substantial nexus" to Appellant's residence, citing *Commonwealth v. Way,* 342 Pa.Super. 341, 492 A.2d 1151 (1985). However, the affidavit sets forth the following pertinent facts: Rowden had been shot; witnesses to the shooting saw Appellant leave Rowden's car holding a pistol and wearing a white shirt; officers had reliable information that Appellant had been living at the specified address, and that shortly after the shooting Appellant had been seen entering the apartment wearing a white shirt and then shortly thereafter leaving the apartment wearing a burgundy colored shirt; Appellant was still at large and the weapon used in the shooting had not been recovered. Thus, police had reason to believe that Appellant had left the clothes he was wearing at the time of the shooting, and possibly the murder weapon and other evidence, at the premises to be searched. Accordingly, the Commonwealth met its burden of showing a substantial nexus between the crime and Appellant's apartment.

 Next, the Appellant alleges various incidents of trial court error throughout voir dire. Preliminarily, we note that the scope of voir dire rests in the sound discretion of the trial judge and his or her decisions will not be reversed unless palpable error is established. *Commonwealth v. Sparrow,* 471 Pa. 490, 370 A.2d 712 (1977). First, Appellant contends that the trial court erred by not conducting individual voir dire as is required in capital cases under Pa.R.Crim.P. 1106. However, no objection was made to the group voir dire employed, and thus the issue is waived. In addition, our review of the record indicates that although group voir dire was initially employed to ask general questions regarding the venire-persons' potential sight or hearing impairments, the venire-persons' potential relationships with law enforcement officers, witnesses or other significant parties, or the venire-persons' prejudices or preconceptions about the case, counsel did have an opportunity to individually voir dire any venire-person in private if desired. *See Commonwealth v. DeHart,* 512 Pa. 235, 516 A.2d 656 (1986). There was no error.

Second, Appellant contends that the Commonwealth's peremptory challenges of two black women, Spears and Mooring, were not supported by racially neutral reasons as required under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). We begin by noting that the record reveals that four black individuals were randomly called to the venire pool; one black man was not reached before the jury selection was complete; two black women, Spears and Mooring, were peremptorily struck by the Commonwealth; and one black person, Jettie Phillips, was chosen to participate as a juror in the trial.

 The record reflects that the Commonwealth explained that its peremptory challenge of venire-person Mooring was based on the fact that Mooring's son was facing trial on assault charges for beating his girlfriend. The evidence to be presented by the Commonwealth at trial involved allegations that the Appellant had threatened and abused the victim, his girlfriend, prior to the shooting. Thus, the reason offered by

the Commonwealth in support of its peremptory challenge of Mooring was sufficient and race neutral.

The record also reflects that the Commonwealth explained that its peremptory challenge of venire-person Spears was based on the fact that Spears' uncle was the Chief Justice of the United States Court of Appeals in the District of Columbia. The prosecutor explained that this relationship would give Spears greater general knowledge of the law and might cause her to hold the Commonwealth to a higher standard of proof. This, coupled with the prosecutor's concern regarding Spear's initial response that she would not be able to impose the death sentence, was a sufficient race neutral reason for utilizing the peremptory challenge.

Third, Appellant contends that the trial court erred in failing to strike for cause venire-person Shutes. Shutes indicated that he was employed as a police dispatcher for Montgomery County. He stated that he had called detectives in the county but had never met them. He also indicated that he could not impartially assess the testimony of Halbert Fillinger, M.D., the Commonwealth's forensic witness, because he was aware of Fillinger's excellent professional reputation through his work as a dispatcher. Appellant contends that under these conditions, Shutes should have been struck for cause, and that because the court would not so strike Shutes for cause, Appellant was forced to use a peremptory challenge and was thereby prejudiced. However, Shutes did state, "I think I can follow what the law would warrant" and that he would be able to consider the evidence in this case fairly and impartially. Moreover, the record does not indicate, nor does Appellant contend that he had exhausted his peremptory challenges prior to the completion of the jury selection process. Thus, Appellant has failed to show prejudice. *Commonwealth v. Jones,* 477 Pa. 164, 383 A.2d 874 (1978).

Fourth, Appellant contends that the trial court erred in striking venire-person Strauss for cause. When asked if she had any religious, moral, or conscientious scruples against sitting as a juror in this case, Strauss answered, "I

don't feel comfortable having to make a decision on someone else's life." She also indicated that "there is always doubt in [her] mind if [imposing the death sentence] is right," and that she would have to be convinced "beyond all doubt" before she would be able to impose the death penalty. Although Strauss did indicate, at times, that she would be able to apply the law, these assurances were equivocal at best, and the trial court found that she had never definitively answered the question of whether she could impose the death penalty if convinced beyond a reasonable doubt. The decision to strike for cause is within the discretion of the trial court and will not be disturbed absent an abuse of that discretion. We do not find that the trial court abused its discretion in striking Strauss for cause under the instant facts. *Commonwealth v. Westerfer,* 308 Pa.Super. 474, 454 A.2d 633 (1982).

Fifth, Appellant contends that the trial court erred in failing to strike venire-person Hipp for cause. Appellant contends that Hipp's answers demonstrated a degree of mental instability, and a fear of losing a weekend employment financial bonus if sequestered over the weekend. A review of the record does not support Appellant's suggestion that Hipp was mentally unstable to any degree. Hipp's concern that she might lose a weekend bonus, while substantiated by the record, is not a sufficient basis for striking her for cause.

Sixth and finally, Appellant contends that the trial court erred in sustaining the Commonwealth's objections to defense counsel's questioning of venire-person Ritter as to her prior experiences as a juror. Ritter indicated that she had served as a juror in a civil trial and as an alternate juror in a criminal rape trial. She indicated that neither experience would in any way predispose her in the instant matter. When asked if the criminal trial resulted in a conviction, the Commonwealth's objection was sustained. In light of Ritter's unequivocal statement that her prior experiences as a juror and alternate juror would not affect her considerations in the instant case, the court's ruling was proper.

Next, Appellant argues that the trial court erred by sustaining the Commonwealth's objection to defense counsel's opening statement wherein defense counsel referred to Appellant's military record. However, Appellant improperly characterizes the nature of the Commonwealth's objection. At sidebar, the Commonwealth noted that defense counsel stated during his opening that he did not know if the Appellant would testify or not, but then referred to Appellant's military record. The prosecutor noted that, as the military record had been mentioned, defense counsel was now obliged to call Appellant or find some other way to prove the military record. The prosecutor reserved the right to point out during his own closing that the military record had not been proven, if no such evidence had been offered. The Court merely acknowledged the Commonwealth's right to do so. There was no error.

Next, Appellant argues that the trial court erred in permitting the introduction of evidence regarding the investigation of the murder of Nigel Anderson. In 1980, Nigel Anderson was murdered. Subsequently, Linda Rowden was murdered. Eight years later, Appellant was convicted of obstruction of justice and conspiracy to violate the civil rights of Nigel Anderson in federal court. Appellant was then tried and convicted of the murder of Linda Rowden. (*"Fisher I"*). During that trial, reference was made to Appellant's conviction in the Nigel Anderson case. Appellant's conviction in the federal "Anderson" case was later reversed, and a Judgment of Acquittal was entered. As a result of the acquittal entered in the federal matter, and the references made to the federal conviction in the *Fisher I* trial, the Appellant's conviction in *Fisher I* was reversed and Appellant was ordered to again stand trial. Appellant was tried again and convicted in the instant matter.

During the trial in the instant matter, a number of law enforcement officers testified regarding various aspects of the Anderson murder investigation. Several officers testified that Appellant voluntarily came in for questioning regarding Anderson's murder. They also testified that Linda Rowden

also voluntarily came in for questioning, and that Appellant saw Rowden talking to the officers. One officer testified that Appellant stated that Rowden was his girlfriend and that he had driven Rowden's car to a motel, where Anderson's body had been found, to meet another woman. Another officer testified that Rowden had given him additional information and that Rowden was a potential witness in the Anderson case. A final officer testified that two days before her murder, Linda Rowden filed a criminal complaint against Appellant alleging that he had assaulted and harassed her because she was giving information to police officers regarding the Anderson murder investigation. Rowden wanted Appellant to be arrested because she was afraid that he would do her bodily harm. The officer contacted Appellant, informed him that Rowden had filed a complaint against him, and warned him to stay away from her. Several officers also testified that no charges were ever filed in Montgomery County against anyone for the murder of Nigel Anderson.

The Court gave the following limiting instruction to the jury in regard to the Anderson murder investigation testimony.

THE COURT: Okay, Members of the jury, the Assistant District Attorney has told you in his opening statement that you will hear evidence concerning the murder of one Nigel Anderson at the Crossroads Motel, Whitpain Township, Montgomery County, on June 1, 1980, and that Mr. Fisher was questioned as part of that murder investigation.

The fact that Mr. Fisher was questioned concerning the murder of Nigel Anderson may not be used by you as any evidence that he, in fact, was involved in that murder. Mr. Fisher does not stand convicted of that murder; nor is he currently under indictment of it. No indictments are pending or contemplated.

Members of the jury, the Commonwealth, in offering this evidence, is doing so for an extremely limited purpose. You may consider evidence surrounding the murder of Nigel Anderson only as it relates to Mr. Fisher being questioned at that time and for no other purposes. You will consider the evidence introduced by the Commonwealth relating to the

murder of Nigel Anderson for a limited purpose. The Commonwealth introduced this evidence in an effort to prove that Mr. Fisher was questioned as part of the investigation in that killing. Again, let me remind you that the defendant does not stand convicted of that murder; nor are any indictments pending or contemplated. The Commonwealth introduced this evidence solely to prove that Mr. Fisher was questioned. The Commonwealth is doing this solely as a background to indicate that Mr. Fisher was questioned with regard to that murder investigation and that, at the same time that he was questioned, Linda Rowden was likewise questioned with regard to what she knew about that particular murder investigation, and that each of them knew that the other was being questioned in regard thereto.

The jury was reinstructed on the same points during the Court's general charge prior to deliberations.

■■■■ Appellant argues that because his federal court conviction (regarding his alleged involvement in the Anderson murder) had been reversed and a judgment of acquittal entered, the Commonwealth was collaterally estopped from suggesting that Appellant was in any way involved in the murder and that, therefore, the admission of the various officers' testimony regarding the Anderson murder investigation was error to the extent that it tended to implicate Appellant in the Anderson killing. We disagree. First, the testimony offered was only that the Appellant was questioned in regard to that killing, not that he was suspected or was otherwise involved in any manner. Second, the evidence was highly probative as to a motive for Appellant's killing of Linda Rowden. Third, the Court gave a lengthy and explicit instruction to the jury regarding the limited purposes for which the evidence could be considered.

The Commonwealth did not seek to relitigate the Anderson murder case or to prove that Appellant was involved in the Anderson killing. The Commonwealth offered the above evidence solely on the issue of what Appellant thought or believed at the time of Rowden's murder. The evidence tended

to show that Appellant *believed* that Rowden was implicating him in the Anderson murder. This evidence, whether the Appellant was *actually* involved in the Anderson killing, was extremely relevant to the Commonwealth's argument regarding the Appellant's motive to kill Rowden.

Appellant further contends that it was error to deny Appellant's offer of evidence that he was acquitted of the federal charges. However, as discussed above, no reference to any charges against Appellant regarding the Anderson killing was ever made. Accordingly, there was clearly no need to offer evidence that Appellant was acquitted of those charges.

Next, Appellant contends that the admission of hearsay statements made by the victim, Linda Rowden, to a police officer two days before her murder, was impermissible. Appellant asserts that the evidence was admitted over defense objections; however, the defense objections were directed only at evidence regarding Appellant's alleged assault of Rowden. The trial court allowed the testimony, with the cautionary instruction that any evidence of an alleged assault by Appellant against Rowden may only be considered as evidence of Rowden's state of mind and not as evidence of a propensity towards violence in Appellant. Thus, the issue is waived.

Even if the issue had been properly preserved, Appellant's argument would fail. Officer Salamone testified as follows:

> Basically [Rowden] contended that the assault and the harassment [by the Appellant] had been taking place upon her due to the fact that she was providing information to the Montgomery County Detectives concerning the Nigel Anderson investigation of the homicide that occurred at the Crossroads Motel . . . [S]he was in fear he might do her bodily harm.

As defense counsel never raised an objection on the basis that the statements were hearsay, the Commonwealth made no offer of proof. If given the opportunity, the Commonwealth could have successfully argued that the statements were not offered to prove the truth of the matters asserted.

The Commonwealth offered evidence that Rowden *alleged,* truthfully or untruthfully, that Appellant had harassed and assaulted her because of her cooperation with authorities in the Anderson murder investigation and that Rowden's *allegations,* true or untrue were communicated to Appellant. Evidence that Rowden *believed* that the Appellant was harassing and assaulting Rowden because of her cooperation in the Anderson murder, whether or not Appellant did, in fact, harass Rowden, is clearly relevant to the Commonwealth's argument that Appellant killed Rowden in retribution for and in order to stop her cooperation with authorities in the Anderson investigation.

Out-of-court statements by a murder victim may be admitted to establish the motive of the defendant when those statements are not offered to prove the truth of the matter asserted. *Commonwealth v. Griffin,* 511 Pa. 553, 515 A.2d 865 (1986). Further, the Commonwealth offered the testimony of Richard Mayo which corroborated the victim's out-of-court statements.[5]

Next, Appellant argues that the trial court erred in allowing the testimony of Commonwealth witness Mayo which referred to Appellant's involvement in the Anderson murder. Although Appellant does not cite to a specific statement in the record, we assume that Appellant is referring to Mayo's testimony that Appellant and the victim were arguing over the victim's involvement in the Anderson killing immediately before Appellant shot the victim. Defense counsel objected to this testimony to the extent that it involved the Anderson killing. The prosecutor argued that the testimony was relevant to motive. The trial court allowed the testimony but cautioned the prosecutor that "I don't want to get too deeply into it." As explained above, the testimony was relevant to motive and in light of the limited reference made as well as

5. Mayo was seated in the front seat of the car that the victim was driving when she was murdered. He testified that the victim and Appellant had been arguing about a statement the victim had made to the police regarding the Anderson killing.

the court's admonition to limit references to the Anderson killing we find no error.

Next, Appellant argues that the trial court erred in granting the Commonwealth's request that defense counsel be precluded from arguing to the jury with regard to Commonwealth witness Mayo's use of heroin at or about the time of the murder. However, a review of the record reveals that defense counsel had ample opportunity to address the subject. Moreover, it is clear that defense counsel did argue the existence of Mayo's heroin addiction at the time of the killing, specifically, during cross-examination and on three separate occasions during closing arguments.

Next, Appellant contends that the trial court erred by making light of witness Mayo's criminal and drug-related history by stating that Mayo was not a "choir boy." However, a review of the record reveals that when asked by defense counsel if he was aware that it was against the law to use drugs, Mayo shook his head, presumably indicating "yes." The trial judge then stated that "I think he admits he wasn't a choir boy." To which defense counsel stated, "That's true, Your Honor." The court's comment does not amount to error.

Next, Appellant contends that the trial court erred in precluding the cross-examination of Mayo as to his *crimen falsi* convictions. A witness may be impeached by showing a prior conviction only if the crime involved dishonesty or false statement. *Commonwealth v. Randall*, 515 Pa. 410, 528 A.2d 1326 (1987); *Commonwealth v. Yost*, 478 Pa. 327, 386 A.2d 956 (1978). Defense counsel asked Mayo if he had been convicted of robbery and burglary in 1973. Mayo answered that he did not recall. Defense counsel then began to ask if Mayo recalled being sentenced to one to two years of imprisonment for one of those offenses. The Commonwealth objected on the basis that Mayo had already stated that he did not recall being convicted of the crimes, and that the question was getting into a collateral matter. The defense was not precluded from offering proof of Mayo's *convictions* of burglary and robbery, but only of evidence regarding the length of his *sentences*

attendant to the alleged convictions for burglary and robbery. The sentences themselves are not *crimen falsi*, and thus, were not proper impeachment evidence. The court properly sustained the objection.

Next, Appellant contends that the trial court erred in precluding the cross-examination of Walker as to her *crimen falsi* convictions. Defense counsel asked Walker what sentence she received as the result of a forgery conviction. She answered that she did not recall. At that point, the Commonwealth objected to the question as irrelevant and the court properly sustained the objection. Later, defense counsel asked Walker if she had ever stolen in order to support her heroin addiction. The Commonwealth objected again on the basis that the question was irrelevant. The trial court properly sustained the objection. As discussed above, the defense was not precluded from offering evidence of Walker's *conviction* of forgery; the defense was precluded only from offering evidence of the *sentence* Walker received as a result of her forgery conviction. Walker's *sentence* is not *crimen falsi*. In addition, prior criminal acts not resulting in a conviction are not admissible to impeach a witness' credibility. *Commonwealth v. Burton*, 491 Pa. 13, 417 A.2d 611 (1980); *Commonwealth v. Ross*, 434 Pa. 167, 252 A.2d 661 (1969). Thus, any evidence in the form of allegations that Walker stole to support her heroin addiction, absent a criminal conviction, is inadmissible to impeach Walker. The court properly sustained the objections.

Next, Appellant argues that the court erred in admitting the identification testimony of Commonwealth witness, Frieda Sambrick. Frieda Sambrick was sitting on the steps of a nursing clinic located approximately 20 to 25 feet from the spot where Rowden's vehicle crashed. Sambrick observed the Appellant, whom she had known for eleven years, seated in the back seat of the vehicle which Rowden was driving. Sambrick observed Appellant lean forward, heard gunshots, heard Rowden scream, saw the car crash, and saw the Appellant run from the back seat of the car.

Sambrick originally identified the wrong man in a police line-up. At Appellant's trial, however, Sambrick unequivocally identified Appellant as the man she observed leaving Rowden's car immediately following the shooting. Sambrick explained that she had initially lied at the line-up because she did not want to get involved in the investigation, as she believed that doing so would endanger herself and her family.

■ Appellant contends that the Commonwealth did not establish an independent basis upon which the reliability of Sambrick's in-court identification testimony could have been based. Appellant contends that Sambrick's earlier misidentification of Appellant "tainted" the police line-up and that Sambrick did not have sufficient opportunity to observe the Appellant at the time of the shooting. We disagree. Appellant misapplies the prior independent basis requirement for in-court identification testimony. Although Sambrick did identify the wrong man in the police line-up, there is no indication in the record, nor does Appellant allege that the police identified the Appellant to Sambrick or engaged in any other suggestive behavior at any time. Thus, there was no need to provide an independent basis for Sambrick's in-court identification.

■ In resolving the issue of the reliability of an in-court identification the court looks to the totality of the circumstances surrounding the identification. The relevant factors are as follows:

[T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation.

*Commonwealth v. Ransome*, 485 Pa. 490, 496, 402 A.2d 1379, 1382 (1979), *quoting Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).

The record reflects that Sambrick had ample opportunity to observe the Appellant at the time of the shooting itself. Sambrick testified that she knew the Appellant prior to the shooting, and that she observed the sequence of significant

events from within a clear and visible distance. Her description of the Appellant and the significant events surrounding the murder were accurate and corroborated by other witnesses. When challenged by defense counsel, Sambrick did not equivocate. Sambrick's observations of the shooting itself provided a sufficient independent basis for her in-court identification of Appellant.

Moreover, misidentification is merely a factor the jury may have considered in assessing the credibility of Sambrick's testimony. We have no reason to question the jury's determination in this regard. This argument is without merit.

Next, Appellant contends that the trial court erred in denying defense counsel the opportunity to cross-examine and impeach Sambrick by way of prior inconsistent statements allegedly made during the suppression hearing. However, a review of the record indicates only that the trial court insisted that the witness be given an opportunity to refresh her recollection by reading her suppression hearing testimony before that testimony was introduced into evidence as a prior inconsistent statement. *Commonwealth v. Dennison*, 441 Pa. 334, 272 A.2d 180 (1971); *Steffy v. Carson*, 422 Pa. 548, 222 A.2d 894 (1966). There was no error.

Next, Appellant argues that the trial court erred by admonishing defense counsel during the cross-examination of Commonwealth witness, Sambrick. Defense counsel had asked Sambrick, "[W]hen did you first hear of or see Mr. Fisher?", at which point the trial court interrupted, stating, "Counsel, I don't want to caution you, but stop asking open-ended questions without any precision." The court then directed the witness to answer the following question, "When did you first meet or see Mr. Fisher?", to which the witness replied, "ninety sixty-nine," [sic] meaning, presumably, 1969. The court's interruption and rephrasing of defense counsel's question merely facilitated the development of defense counsel's intended line of inquiry with a heightened degree of precision. There was no error.

■ Next, Appellant argues that the trial court erred by sustaining the Commonwealth's objection to defense counsel's cross-examination of Commonwealth witness Sambrick regarding her use of alcohol. Again, Appellant fails to cite to a specific statement in the record, but we assume Appellant is referring to the following question of defense counsel to Sambrick: "And, in fact, between 1980 and 1987, you frequented other bars in this area, correct?" The Commonwealth objected to this question as irrelevant, and the trial court sustained the objection. Appellant offered no evidence that Sambrick was intoxicated on the day she witnessed the shooting. As the question was clearly irrelevant to Sambrick's condition or her ability to observe events on the day of the shooting, there was no error.

Next, Appellant argues that the trial court erred in failing to sustain defense counsel's objection to conclusory evidence offered by Commonwealth witness Sambrick. Sambrick testified to those facts which she witnessed. Specifically, that she heard a woman scream; saw the Appellant in the backseat of a car behind the victim; saw Appellant lean forward; heard a "boom" indicating a gunshot; and then saw the car crash into parked cars. There was nothing inappropriate or conclusory about Sambrick's testimony.

Next, Appellant contends that the trial court erred in failing to instruct the jury that inconsistent statements by witnesses could be used as substantive evidence and not only for impeachment purposes. However, the record reveals that at the close of the court's instructions to the jury, the court asked both counsel if any additional charges or corrections were necessary. The Commonwealth pointed out that the court had not yet instructed on prior inconsistent statements. The Court then proceeded to instruct the jury as requested by the Commonwealth. The Court instructed that the jury was to determine whether there existed any prior inconsistent statements, and whether the statements challenged the truthfulness of the witnesses' statements at trial. However, as defense counsel never requested a different instruction or a correction to the instruction which was given, before the

260

beginning of jury deliberations, the issue is waived. *Commonwealth v. Johnson*, 484 Pa. 545, 400 A.2d 583 (1979); *Commonwealth v. Kampo*, 480 Pa. 516, 391 A.2d 1005 (1978).

Next, Appellant contends that the court erred by sustaining the Commonwealth's objection to testimony concerning statements made by an individual identified as "Butch" to Appellant. Appellant testified that at the time of the murder he was physically ill, by reason of his use of alcohol and drugs, and was vomiting in a nearby alley when word of the shooting began to race through the neighborhood. The Appellant then began to testify as to what "Butch" said to him, when the Commonwealth objected to the testimony on the grounds that "Butch's" statement to Appellant was inadmissible hearsay. The objection was properly sustained. *Johnson v. Peoples Cab Co.*, 386 Pa. 513, 126 A.2d 720 (1956); McCormick, *Evidence*, § 246 (2nd ed. 1972). Defense counsel took no exception to the ruling. Appellant argues that the statement related to the recent shooting and therefore fell within the res gestae/excited utterance exception to the general rule of exclusion of hearsay evidence. However, a review of the record reveals that defense counsel neither took an exception to the ruling nor made an offer of proof as to the statement being in the nature of an excited utterance entitled to exception from the general rule of exclusion. Thus, we have no means of determining what the contents of "Butch's" statement may have been and are therefore unable to determine whether the statement may have fallen within the res gestae/excited utterance exception. The Superior Court dealt with this precise issue in *Williamson v. Philadelphia Transp. Co.*, 244 Pa.Super. 492, 368 A.2d 1292 (1976) and stated:

In the instant case the appellant did not make an offer of proof as to what the two female bystanders actually stated to the police officer. Appellant did not establish that the two declarants actually saw the accident or that their statements related to the litigated event. Because we do not know the substance of their statements, we cannot determine if the lower court erred in excluding the disputed testimony.

*Williamson*, at 500, 368 A.2d at 1296. Accordingly, the evidence as offered was clearly inadmissible hearsay and was properly excluded.

Next, Appellant contends that the trial court erred in sustaining the Commonwealth's objection to defense counsel's cross-examination of Lt. Durante with regard to fingerprints. Lt. Durante testified that he had lifted fingerprints from the car in which the victim was murdered, but did not personally compare the lifted prints to Appellant's known fingerprints. On cross-examination, defense counsel asked Lt. Durante if any of the prints lifted matched Appellant's prints. The Commonwealth objected to the question as outside the scope of the witness' knowledge. The trial court agreed, indicating that, at best, the question was eliciting hearsay testimony. *See Johnson v. Peoples Cab Co.*, 386 Pa. 513, 126 A.2d 720 (1956). The court then properly sustained the objection. There was no error.

Next, Appellant contends that the trial court erred by instructing witness Manilla to lecture the jury thereby giving Manilla's testimony more credence than it was due. However, a review of the record reveals that, upon Manilla's entry into the witness box, the court instructed Manilla to "run your voice across [the microphone]. The last lady near the leather door has to hear you. So pretend that you're in civics class and giving a speech." The Court's instructions were obviously intended to instruct the witness to keep his voice at a level so that he could be heard by the jury. There was no error.

Next, Appellant argues that the trial court erred in sustaining the Commonwealth's objection during cross-examination of Commonwealth witness, Lt. Woodward, based on the question having been asked and answered. During cross-examination, defense counsel asked Lt. Woodward if he had interviewed people other than the victim and the Appellant in regard to the Nigel Anderson murder. Lt. Woodward answered in the affirmative. Defense counsel then asked if Lt. Woodward could give a rough estimate of how many people were interviewed. Lt. Woodward answered, "I wouldn't hazard a guess, no, sir." Defense counsel then asked whether several specific

individuals were interviewed. Lt. Woodward acknowledged that they were. When defense counsel asked Lt. Woodward again if he could give a rough estimate of the number of people interviewed, the Commonwealth objected on the basis that the question had been asked and answered. *Commonwealth v. Stoner*, 284 Pa.Super. 364, 425 A.2d 1145 (1981). The trial court properly sustained the objection.

Next, Appellant contends that the court erred in overruling defense counsel's objection to the testimony of FBI Technician Riley as not responsive to the question. On direct examination, Riley testified to scientific comparisons of bullets found in the Appellant's apartment and bullets found in the victim's body. From this evidence, Riley opined that the bullets came from the same box of bullets. On cross-examination, defense counsel asked Riley what the term "homogenous" meant in the context of a "homogenous" melt of lead in the bullet making process. Riley answered the question by thoroughly describing how in a typical factory bullet making process, a single melt of lead does not provide bullets of a consistent nature— i.e., that the melt is not homogenous. There was absolutely nothing improper about Riley's detailed explanation. In the course of this explanation, defense counsel interrupted Riley and asked the court to discontinue the answer; the court declined, accurately indicating that the answer was in response to defense counsel's question. There was no error.

Next, Appellant contends that the trial court erred in refusing to sustain defense counsel's objection to a question which had been asked and answered. On direct examination the Commonwealth asked Riley his opinion of the similarity between the bullets found in Appellant's apartment and the bullets found in the victim's body. Riley indicated that in his opinion there was a high degree of similarity. On cross-examination, defense counsel attempted to completely discredit Riley and the techniques upon which he based his opinion. On re-direct, the Commonwealth merely asked Riley whether in light of defense counsel's cross examination, Riley's opinion as to the similarity of the bullets remained the same. Defense counsel objected to the question as asked and answered on

direct. The trial court overruled the objection and allowed the answer. We note that the trial court has broad discretion as to the admission or exclusion of evidence. *Commonwealth v. Claypool,* 508 Pa. 198, 495 A.2d 176 (1985). We find no error in the trial court's decision to allow the question.

Next, Appellant argues that the trial court erred in refusing the Appellant's requested points for charge 1, 2, and 3. However, defense counsel made no specific objection to the court's decision, and the issue is waived. *Commonwealth v. Martinez,* 475 Pa. 331, 380 A.2d 747 (1977).

As all of Appellant's arguments regarding the guilt phase of his trial have been found meritless, we will affirm Appellant's conviction of murder in the first degree.

We now turn to Appellant's arguments of error pertaining to the penalty phase of the trial. As we find it necessary to vacate the judgment of sentence and remand this case for a new sentencing hearing we will only address that issue upon which we base our decision.[6]

The issue as presented by Appellant is that the trial court erred by allowing the Commonwealth to present "victim impact" evidence during the penalty phase hearing. Specifically, Appellant argues that although the United States Supreme Court in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), has reversed its earlier position on "victim impact" testimony, the sentencing scheme enacted by our legislature does not encompass such testimony, and thus, the trial court erred in allowing its admission. We agree with Appellant that the capital sentencing scheme in effect at the

**6.** The penalty phase issues which we do not reach are stated by Appellant as follows: 1. The sentencing court erred in permitting the Commonwealth to proceed under the aggravating circumstance set forth in 42 Pa.C.S. § 9711(d)(15), which was promulgated after the killing but before Appellant's trial; 2. The sentencing court erred in permitting Lt. Timothy Woodward to testify concerning "records" which were not properly authenticated; 3. The sentencing court erred in instructing the jury on only one mitigating circumstance; and, 4. The sentencing court erred in sustaining the Commonwealth's objection to defense counsel's closing argument during the penalty phase.

time of his trial precluded the admission of "victim impact" testimony.[7]

Prior to *Payne*, the United States Supreme Court had prohibited the use of "victim impact" testimony in capital cases as such testimony was considered to violate the Eighth Amendment.[8] In *Payne* the Court reversed its earlier position and declared that "victim impact" testimony is not violative of the Eighth Amendment. Only where the States allow the introduction of evidence which is unduly prejudicial will the United States Supreme Court find that the process utilized has been fundamentally unfair and the due process rights of the accused violated.

> We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence

---

7. On October 11, 1995, the death penalty statute was amended so as to permit evidence concerning the victim and the impact that the victim's death had on the family of the victim to be admitted in the sentencing hearing. The amendment, which was to take effect 60 days thereafter, applies only to sentences imposed for offenses which took place on or after its effective date. Thus, the amendment does not apply to the offense committed by the Appellant. References in this opinion to our capital sentencing scheme are limited to the scheme in effect prior to the 1995 amendment.

8. The initial decision declaring "victim impact" testimony violative of the Eighth Amendment came in the case of *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). The *Booth* Court found that such evidence would be emotionally charged and thus, interfere with the reasoned decision making process required in capital cases. *Id.* at 508–09, 107 S.Ct. at 2535–36.

Following *Booth*, the court considered in *South Carolina v. Gathers*, 490 U.S. 805 [109 S.Ct. 2207, 104 L.Ed.2d 876] (1989), the question of whether the prosecutor could urge the jury in his closing statements to sentence Gathers to death on the basis of the personal characteristics of Gathers' victim. Analogizing the prosecutor's argument to the introduction of victim impact statements utilized in *Booth*, the Court found the prosecutor's argument improper as the victim's character was irrelevant to the circumstances of the crime.

*Booth* and *Gathers* reflect the sentencing philosophy that the defendant should be punished for his actions upon careful consideration of the defendant's character and background and the circumstances of the particular crime. The punishment should not be related to "factors about which the defendant was unaware, and that were irrelevant to the decision to kill." *Booth*, 482 U.S. at 505, 107 S.Ct. at 2534.

about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

*Payne,* 501 U.S. at 827, 111 S.Ct. at 2609.

In abandoning the per se rule proscribing victim impact evidence in a capital trial, the U.S. Supreme Court emphasized the traditional latitude of the States to establish the sentencing procedures and appropriate punishment.

Under our constitutional system, the primary responsibility for defining crimes against state law, fixing punishments for the commission of these crimes, and establishing procedures for criminal trials rests with the States. The state laws respecting crimes, punishments, and criminal procedure are, of course, subject to the overriding provisions of the United States Constitution. Where the State imposes the death penalty for a particular crime, we have held that the Eighth Amendment imposes special limitations upon that process.

\* \* \* \* \* \*

"Within the constitutional limitations defined by our cases, the States enjoy their traditional latitude to prescribe the method by which those who commit murder shall be punished." *Blystone v. Pennsylvania,* 494 U.S. 299, 309, 110 S.Ct. 1078 [1084], 108 L.Ed.2d 255 (1990). The States remain free, in capital cases, as well as others, to devise new procedures and new remedies to meet felt needs. Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities.

*Payne,* 501 U.S. at 824–25, 111 S.Ct. at 2608.

The U.S. Supreme Court held that "if the state chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar." *Id.* at 827, 111 S.Ct. at 2609. The Court's

holding did not automatically rewrite the death penalty statute of any state, including that of Pennsylvania, to allow a prosecutor to introduce victim impact evidence at the capital sentencing hearing. The Court's decision merely eliminated the federal constitutional prohibition against the use of such evidence.

In light of the decision in *Payne* this Court must consider whether our capital sentencing scheme would permit the admission of relevant "victim impact" testimony. The pertinent part of the Pennsylvania Sentencing Code provided as follows:

> (2) In the sentencing hearing, evidence may be presented as to any matter that the court deems relevant and admissible on the question of the sentence to be imposed and shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d) and (e). Evidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d).

42 Pa.C.S. § 9711(a)(2).

Appellant asserts that the above section should be read as limiting the admission of evidence at the penalty stage to only that which is specifically relevant to an enumerated aggravating or mitigating factor. Guided by the fundamental principle of statutory construction that penal provisions are to be strictly construed, 1 Pa.C.S. § 1928, we must agree. The imposition of capital punishment may not rest on a mere supposition that the Legislature intended victim impact evidence to be considered by a jury, but only upon the clear and unambiguous language of the death penalty statute. The absence of any reference to victim impact evidence in the death penalty statute, and the historical development of the statute, compel us to conclude that the above language did not authorize a trial court to allow the introduction of any evidence unrelated to the aggravating circumstances or mitigating circumstances presented during the sentencing procedure.

In *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), the U.S. Supreme Court upheld the

constitutionality of the Pennsylvania death penalty statute. The Court summarized the constitutional limitations in imposing the death penalty.

First, there is a required threshold below which the death penalty cannot be imposed. In this context, the State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold. Moreover, a societal consensus that the death penalty is disproportionate to a particular offense prevents a State from imposing the death penalty for that offense. Second, States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant.

*Id.* at 308–09, 110 S.Ct. at 1084. (Citation omitted.)

The Pennsylvania death penalty met those limitations because a sentencing jury is permitted to consider all relevant mitigating evidence and death is not automatically imposed upon conviction for certain types of murder. "Section 9711 does not limit the types of mitigating evidence which may be considered, and subsection (e) provides a jury with a nonexclusive list of mitigating factors which may be taken into account—including a "catchall" category providing for the consideration of 'any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.'" *Id.* at 304, 110 S.Ct. at 1082.

The death penalty statute as originally enacted did not permit the defendant to introduce evidence of mitigation concerning his character, record, or circumstances of his offense. The "catchall" provision was nonexistent. Instead, mitigating circumstances were restricted to: (1) the age, lack of maturity, or youth of the defendant at the time of the killing; (2) the victim was a participant in or consented to the defendant's conduct or was a participant in or consented to the killing; and (3) the defendant was under duress. This statute was found to be unconstitutional because it limited the sentencing

jury's consideration of relevant circumstances that could cause it to decline to impose the death penalty.

The earlier death penalty statute provided, in part:

**(c) Procedure at sentencing hearing.**

—After such verdict is recorded and before the jury is permitted to separate, the court shall proceed to receive such additional evidence not previously received from the trial *as may be relevant and admissible upon the question of aggravating and mitigating circumstances* and shall permit such argument by counsel, and deliver such charge thereon as may be just and proper in the circumstances.

(Emphasis added.) Once the statute was amended, however, to allow a broad spectrum of evidence to be introduced as a mitigating circumstance, this provision was amended also. The amendment resulted in the language of 42 Pa.C.S. § 9711(a)(2), that "evidence may be presented as to any matter that the court deems relevant and admissible on the question of the sentence to be imposed . . . ."

When the historical context of the amendments to the death penalty statute is examined, it becomes obvious that § 9711(a)(2) was rewritten in response to the expansion of mitigating circumstances that could be introduced at trial. The amendment gave latitude to the Commonwealth to introduce evidence to counter and respond to whatever mitigating evidence was introduced that fell within the "catchall" provision for mitigating circumstances. It was not intended to supply the Commonwealth with its own "catchall" provision for "any other" evidence, such as victim impact evidence, in its penalty phase case.

Having determined that "victim impact" testimony is not admissible during the penalty phase of a capital case, we now turn to the specific testimony at issue and the instructions given to the jury regarding that testimony. The Commonwealth offered the testimony of Betty Rowden, the victim's mother, regarding the impact which the victim's murder had on the victim's family.

Betty Rowden testified regarding the closeness of the family, specifically, that the family never had baby-sitters, never went on vacation except as a whole family, and kept in close contact by telephone when they could not be physically near one another. She testified that following the murder, the family was forced to move to another state, away from the home that Linda's father had built when Linda was a baby, because Linda's mother and father "just could not stay in that area anymore.... It just had too many memories.... We always had big Christmases, big holidays, and everybody always came to our place for Christmas.... Linda and our other daughter was [sic] always involved.... And there were too many things she had given us, pictures on the wall." Betty Rowden further testified that before the move to their new home, Linda's mother and father were unable to use the upstairs of their home because of all the memories—"we just closed off the upstairs of the house and didn't live there." When asked, "Did the murder of Linda have any effect on— physical effect on you or any member of your family?," Betty Rowden replied, "Well my husband has been very sick since then, heart problem, plus a severe COPD," (indicating an obstructive pulmonary disease). Betty Rowden further testified that their move out of the state left her with a feeling that she had "left our—our other daughter and our grandchildren." She also testified that she felt that her "grandchildren were cheated out of an aunt," that "[Linda Rowden] idolized [the oldest grandson]," and that "the [two younger grandchildren who were born after Linda Rowden's death] can only hear the [rest of the family] talking about Aunt Linda."

Over the objection of the Appellant, the trial court admitted Mrs. Rowden's testimony and charged the jury in the penalty phase instructions with regard to that testimony as follows:

Members of the jury, you have now heard testimony from the victim's mother, Mrs. Rowden. In order that you may assess meaningfully the Defendant's moral culpability and blameworthiness, this evidence of the specific harm caused by the Defendant should be considered by you during the penalty phase of this trial.

The Commonwealth is permitted to and has a legitimate interest in counteracting the Defendant's mitigating evidence by reminding you that, just as the murderer should be considered as an individual, so too the victim, Linda Rowden, is an individual whose death represents a unique loss to society and, in particular, to her family.

The trial court's charge in the penalty phase improperly instructed the jurors that the victim impact evidence could be considered in determining whether the death sentence should be imposed. The charge directed the jurors to consider the victim impact evidence in deciding whether to impose a life sentence or the death penalty upon Appellant. The impact of the victim's death on society and her family is not a legitimate factor on which a sentence of death can be based. There was only one mitigating circumstance submitted to the jury— Appellant's service record and his conduct in the service of his country during the Vietnam War. The trial court obviously mischaracterized the victim impact evidence as evidence counteracting Appellant's mitigating evidence.

The trial court's charge confused the jurors and prompted them to inquire whether the victim impact evidence should be used as an aggravating circumstance on a form supplied to them, or whether "it should be considered verbally-mentally but not written on the form." N.T. August 28, 1991, pp. 126–27. The trial court instructed the jurors "do not place the victim's family's effects on the form," but to "consider it mentally" in their deliberations. N.T. p. 127. The clear import of the inquiry was that the jurors did not understand what significance was to be given to the victim impact evidence, but believed that the evidence was being introduced as an aggravating circumstance. The trial court's response did not alleviate this problem. Instead, the jurors were sent a mixed message. They were told to consider the evidence "mentally," without guidance as to how to weigh evidence which neither established an aggravating circumstance nor rebutted evidence of a mitigating circumstance.

The jury was obviously confused as to the weight this testimony was to be given in their deliberations and may have viewed the victim impact testimony as an aggravating circumstance. This interjected an arbitrary and impermissible factor into the sentencing decision of the jury. Accordingly, this Court affirms the conviction for murder in the first degree, vacates the judgment of sentence, and remands this matter for a new sentencing hearing.

CAPPY, J., files a concurring opinion.

CASTILLE, J., files a dissenting opinion in which NEWMAN, J., joins.

CAPPY, Justice, Concurring:

Although I concur in the decision of the majority that this case must be remanded for a new penalty hearing, I strongly disagree with the majority's conclusion that "victim impact" testimony is not admissible at the penalty phase of a capital case.

As the majority so eloquently sets forth, prior to *Payne,*[1] the United States Supreme Court had prohibited the use of "victim impact" testimony in capital cases as such testimony was considered to violate the Eighth Amendment. In *Payne,* the Court reversed its earlier position and declared that "victim impact" testimony is not violative of the Eighth Amendment. The *Payne* decision focused upon the role of the States in deciding what factors are to be relevant in a determination of the appropriate penalty in a capital case.

> We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There

1. *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

is no reason to treat such evidence differently than other relevant evidence is treated.

*Payne,* 501 U.S. at 827, 111 S.Ct. at 2609.

In light of the decision in *Payne,* this court must now consider whether our capital sentencing scheme would permit the admission of relevant "victim impact" testimony. The pertinent part of the Pennsylvania Sentencing Code necessary to such a consideration provides as follows:

> (2) In the sentencing hearing, *evidence may be presented as to any matter that the court deems relevant and admissible on the question of the sentence to be imposed* and shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d) and (e). Evidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d).

42 Pa.C.S.A. § 9711(a)(2) (emphasis added).[2]

The Majority reads the above section as limiting the admission of evidence at the penalty stage to only that which is specifically relevant to an enumerated aggravating or mitigating factor. I respectfully disagree and instead read the above language as empowering the trial court to allow the introduc-

---

2. I note that this section of the statute has recently been amended and that the amendment specifically authorizes the admission of "victim impact" testimony. The section as amended now reads:

> (2) In the sentencing hearing, evidence concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible. Additionally, evidence may be presented as to any other matter that the court deems relevant and admissible on the question of the sentence to be imposed. Evidence shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d) and (e), and information concerning the victim and the impact that the death of the victim has had on the family of the victim. Evidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d).

The amendment was enacted October 11, 1995 to be effective 60 days thereafter; thus, it is not dispositive of appellant's claim. Further, I do not find the specific amendment of this section to alter my position on this issue, as we conclude that "victim impact" testimony is always a "relevant" consideration and within the scope of the sentencing scheme. I believe that the legislature's amendment specifically referring to "victim impact" testimony merely clarifies the matter and makes this statute consistent with the legislative enactment at 71 P.S. § 180–9, titled *Basic Bill of Rights For Victims.*

tion of any evidence "relevant and admissible on the question of the sentence to be imposed."

In *Commonwealth v. Abu–Jamal*, 521 Pa. 188, 555 A.2d 846 (1989), this court specifically rejected the argument that 42 Pa.C.S. § 9711(a)(2) limits the presentation of evidence to only those matters specifically enumerated as aggravating and mitigating factors. In that case, the defendant sought to introduce information to the jury about his character and background which would influence them in favor of a life sentence, and to prohibit the prosecution from rebutting that testimony and presenting evidence in contradiction to the defendant's statements. The defendant based his argument on the language of § 9711(a)(2), claiming that the prosecution could only introduce evidence relevant to an enumerated aggravating or mitigating factor. This court rejected that argument:

> We do not read the statute as limiting the scope of the sentencing hearing to this extent.... If matters relating to the aggravating and mitigating circumstances were the only matters capable of being explored, the first phrase emphasized above would be surplusage, indeed, misleading surplusage. Such a reading would, of course, be contrary to the most basic rules of statutory construction.

*Abu–Jamal*, 521 Pa. at 213, 555 A.2d at 858 (1989). The *Abu–Jamal* court then went on to explain that, although a sentence of death can only be imposed **because** of the factors enumerated within the statute, that does not require that the sentencing hearing be limited only to evidence going to one of the specific aggravating or mitigating factors. All relevant evidence, that does not unduly prejudice the defendant, should be admitted so that the jurors may have the benefit of as much information as possible when considering such a grave decision.[3] *Id.* at 214, 555 A.2d at 859.

3. If "victim impact" testimony is used by the Commonwealth to argue that the defendant should be put to death **because** of the impact the killing of this particular victim had upon his/her family, then the proffered "victim impact" testimony would be inadmissible as unduly inflammatory and beyond the scope of our decision in *Abu–Jamal*, and

In non-capital cases a "victim impact" statement is a required portion of all pre-sentence investigation reports. *See* Pa.R.Crim.P., Rule 1403 A(4). Further, the Pennsylvania legislature obviously considers "victim impact" testimony to be a relevant and important consideration in sentencing. The **BASIC BILL OF RIGHTS FOR VICTIMS**, 71 P.S. § 180–9.3, provides in part as follows:

Victims of crime have the following rights:

(5) To have the opportunity to offer prior comment on the sentencing of a defendant to include the submission of a written victim impact statement detailing the physical, psychological and economic effects of the crime on the victim and the victim's family, which statement shall be considered by the judge when determining the defendant's sentence.

The "victim" is defined at 71 P.S. § 180–9.1(3) to include: "**A family member of a homicide victim,** including stepbrothers or stepsisters, stepchildren, stepparents or a fiance. . . ." (emphasis supplied).

In all non-capital sentencing hearings "victim impact" statements are provided to the sentencing authority for consideration in the deliberative process which culminates in the imposition of a particular sentence upon a particular defendant as a result of the specific crime at issue. I can see no justification for requiring "victim impact" statements to be considered in non-capital cases and simultaneously prohibiting the consideration of such evidence in capital cases.[4]

"It is the province of the legislature to determine the punishment imposable for criminal conduct." *Commonwealth v. Wright,* 508 Pa. 25, 40, 494 A.2d 354, 361 (1985), *aff'd sub nom. McMillan v. Pennsylvania,* [477] U.S. [79], 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) (citing cases). The legislature has enacted a statutory scheme so that a determination can be made as to whether the death penalty beyond the intent of the legislative scheme set forth in 42 Pa.C.S. § 9711.

4. As noted in footnote 2 supra, the legislature has now amended 42 Pa.C.S. § 9711 (a)(2); with this amendment, section 9711(a)(2) is now wholly consistent with 71 P.S. § 180–9.3.

should be imposed in a given case. The statute embodies the legislature's judgment as to what specific factors relating to the nature of the crime and the character and record of the accused should be considered in making that determination. The discretion of the sentencing body is thereby limited and channeled in a manner which we have held is adequate to prevent the arbitrary and capricious imposition of the death sentence. *Commonwealth v. Zettlemoyer,* [500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983) ].

*Commonwealth v. DeHart,* 512 Pa. 235, 263, 516 A.2d 656, 671 (1986).

As it is clear that our legislature has decided that victim impact statements are a relevant consideration for the sentencing authority, and has authorized the trial court to allow the admission of all relevant information in a penalty phase hearing, I would conclude that "victim impact" testimony may be considered by the jury as relevant to their sentencing determination in a capital case.

In reaching this conclusion I find compelling the reasoning employed by Justice Souter in the concurring opinion in *Payne:*

> To my knowledge, our legal tradition has never included a general rule that evidence of a crime's effects on the victim and others is, standing alone, irrelevant to a sentencing determination of the defendant's culpability. Indeed, ... criminal conduct has traditionally been categorized and penalized differently according to consequences not specifically intended, but determined in part by conditions unknown to a defendant when he acted.

> . . . .

> Murder has foreseeable consequences. When it happens, it is always to distinct individuals, and after it happens other victims are left behind.... The fact that the defendant may not know the details of a victim's life and characteristics, or the exact identities and needs of those who may

survive, should not in any way obscure the further facts that death is always to a "unique" individual, and harm to some group of survivors is a consequence of a successful homicidal act so foreseeable as to be virtually inevitable.

*Payne,* 501 U.S. at 835 and 838, 111 S.Ct. at 2614 and 2615, 115 L.Ed.2d at 742 and 744.

Although I would hold that "victim impact" testimony is not, per se, prohibited during the penalty phase of a capital case, and is a relevant consideration, I am compelled to agree with the majority that a new sentencing hearing is required in the instant case. However, I reach this conclusion only because I believe that the instructions given to the jury regarding the "victim impact" testimony in the case at bar were inadequate, and, thus a new penalty hearing is required.

CASTILLE, Justice, Dissenting:

I dissent from the majority's reversal of appellant's sentence of death and holding that "victim impact" testimony is not admissible during the penalty phase of a capital case. Instead, I agree with the concurring opinion's determination that "victim impact" testimony is a relevant consideration for a jury during the penalty phase of a capital case. I write separately, however, because I believe that even if the challenged testimony did constitute "victim impact" testimony, the trial court's instructions in the case *sub judice* were adequate to advise the jury of the proper light in which it would consider such evidence. Hence, I would affirm appellant's sentence of death.

In addition to holding that "victim impact" testimony is *per se,* inadmissible, the majority also speculates that the jury was confused about the effect the "victim impact" testimony was to play in their deliberations upon the sentence.[1] The majority asserts that the jury *may have* believed that the "victim

1. I do not believe that the jury's single question during deliberations inquiring whether the effect of the victim's death on the victim's family should be used as an aggravating circumstance proved confusion. As discussed *infra,* in response to the question, the trial court gave a clear instruction that the jury was *not* to place the effect of the victim's death on the victim's family on the verdict form, but rather the jury must only consider it mentally in their deliberations. Furthermore, appellant's

impact" testimony was to be weighed equally in their deliberations with the submitted aggravating and mitigating factors, or that the testimony was to be considered evidence of another aggravating circumstance. The majority contends that this confusion resulted from the trial judge's instruction to the jury which "mischaracterized" the victim's testimony as evidence counteracting appellant's mitigating evidence.

However, contrary to the majority's assertion, the trial judge's charge to the jury did not *in any way* instruct the jury to consider the victim's testimony as evidence of an aggravating circumstance. The words "aggravating circumstance" were never used in the context of "victim impact" testimony. Rather, the trial judge instructed the jury that in considering the "victim impact" testimony and the Commonwealth's interest in counteracting the defendant's mitigating evidence, they should consider that "just as the murderer should be considered an individual, so too the victim, Linda Rowden, is an individual whose death represents a unique loss to society and, in particular, to her family."

It is well settled that there is a presumption in the law that a jury will follow the court's instructions, thus, I believe any confusion that the majority speculates the jury may have suffered was cured by the additional information provided to the jury by the trial judge after the jury presented its question regarding the testimony during their deliberations. *Commonwealth v. Tilley,* 528 Pa. 125, 142, 595 A.2d 575, 583 (1991). The trial judge adequately instructed the jury that such testimony was not to be considered evidence of an aggravating circumstance but rather, it should only be considered mentally in their deliberations. The judge's answer adequately ensured that the jury understood the manner in which they would consider the "victim impact" testimony.

counsel did not at any time poll the jury or attach affidavits from the jurors to substantiate the allegation that the jurors were still confused about the use of the "victim impact" testimony, assuming such confusion existed, which would arguably give the majority a basis for its present ruling on this topic. *Commonwealth v. Patrick,* 416 Pa. 437, 440, 206 A.2d 295, 296 (1965)(a defendant has an absolute right to poll the jury; however, such a right is dependent upon the defendant to make such a request).

Moreover, the majority's reversal of appellant's death sentence on the basis of speculation regarding the jury's deliberations is unnecessary because the aggravating circumstance found by the jury was wholly unrelated to the "victim impact" testimony. The jury found that appellant murdered the victim, his ex-girlfriend, because he believed she was providing the police with information concerning appellant's alleged previous involvement in another murder. *See*, 42 Pa.C.S. § 9711(d)(15).[2] This aggravating circumstance is not related in any manner to the substance of the testimony of the victim's mother, Betty Rowden. Ms. Rowden's testimony concerned how the murder of her daughter devastated her life and the close relationship her family had enjoyed before her daughter was murdered by appellant. Such testimony did not provide any evidence that the victim was providing the police with any information regarding appellant's criminal activities; thus, even if the jury was confused about the effect the "victim impact" testimony was to play upon their deliberations, such confusion resulted only in harmless error. The jury's finding that the aggravating circumstance outweighed the mitigating evidence mandates that the death penalty be imposed. 42 Pa.C.S. § 9711(c)(1)(iv). There is simply no indication in this case that the jury, following the trial judge's accurate instruction and his subsequent curative answer to their question, improperly considered the "victim impact" testimony during their deliberations or in determining that the aggravating circumstance was proven beyond a reasonable doubt and outweighed the mitigating evidence presented. *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988); *Commonwealth v. Young*, 524 Pa. 373, 572 A.2d 1217 (1990), *cert. denied*, —— U.S. ——, 114 S.Ct. 1389, 128 L.Ed.2d 63 (1994). Accordingly, I dissent from the majority and would affirm the sentence of death.

NEWMAN, J., joins in this dissenting opinion.

**2.** The Commonwealth presented evidence that appellant believed the victim was providing the police with evidence implicating appellant in a conspiracy which resulted in the murder of a federal narcotics witness.