J-A03035-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| TARIQ D. JENKINS | |
| Appellant | No. 229 EDA 2015 |

Appeal from the Judgment of Sentence August 12, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0000679-2013

BEFORE:  GANTMAN, P.J., MUNDY, J., and DUBOW, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED MARCH 08, 2016**

Appellant, Tariq D. Jenkins, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his jury trial convictions for first-degree murder, firearms not to be carried without a license, carrying firearms on public streets or public property in Philadelphia, and possessing instruments of crime.[1]  We affirm.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.[2]  Therefore, we have no reason to restate them.

Appellant raises five issues for our review:

---

[1] 18 Pa.C.S.A. §§ 2502(a); 6106(a)(1); 6108; 907(a), respectively.

[2] Appellant timely filed his Rule 1925(b) statement on April 15, 2015.

WHETHER THE TRIAL COURT IMPROPERLY DENIED APPELLANT'S MOTION *IN LIMINE* TO BAR CHRISTIAN JONES'S 75-483 STATEMENT THAT JONES SAW A HANDLE OF A GUN ON [APPELLANT'S] PERSON?

WHETHER THE TRIAL COURT IMPROPERLY DENIED APPELLANT'S MOTION *IN LIMINE* TO BAR CHRISTIAN JONES'S DOUBLE HEARSAY STATEMENT TO POLICE CONTAINED IN A POLICE 75-483 FROM UNKNOWN DECLARANTS WHO WERE UNAVAILABLE AT TRIAL?

WHETHER IT WAS ERROR FOR THE JUDGE TO PERMIT COMMONWEALTH'S WITNESS, DETECTIVE OMAR JENKINS, TO READ CHRISTIAN JONES'S STATEMENT CONTAINED IN A 75-483 TO THE JURY AS A PRIOR INCONSISTENT STATEMENT?

WHETHER THE COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS HIS FACEBOOK ACCOUNT INFORMATION OBTAINED ILLEGALLY FROM OUT-OF-STATE WITH A PENNSYLVANIA WARRANT?

WHETHER THE TRIAL COURT EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO CONVICT APPELLANT BEYOND A REASONABLE DOUBT OF MURDER?

(Appellant's Brief at 4-5).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Genece E. Brinkley, we conclude Appellant's issues merit no relief. The trial court's opinion comprehensively discusses and properly disposes of the questions presented. (***See*** Trial Court Opinion, filed June 2, 2015, at 20-28; 30-32) (finding: **(1)** evidence that witness saw handle of gun in Appellant's possession on day of murder was relevant to prove Appellant was in possession of weapon similar to one used in murder on that date; any

- 2 -

uncertainty about whether handle of gun witness saw in Appellant's possession was actual murder weapon went to weight jury placed on evidence, not to its admissibility;[3] **(2)** Appellant sought to preclude witness' statement to police, in which witness stated unknown declarant had said to Appellant: "How you let [Victim] pull a gun on you and you don't do anything about it"; statement was admissible because Commonwealth did not offer it to prove truth of matter asserted (that Victim pulled gun on Appellant and Appellant did not respond), but only to show effect on Appellant as listener and Appellant's state of mind, especially when considered in connection with Appellant's response to statement by pulling up his shirt to reveal handle of gun and stating: "I'm not playing no more"; moreover, court issued cautionary instruction, approved by defense counsel, that statement's purpose was only to show effect on listener and Appellant's state of mind; **(3)** court permitted detective to read at trial witness' pre-trial statement to police after witness testified at trial inconsistently with his prior statement; witness claimed in statement to police that he had personally observed Appellant shoot Victim multiple times, but he denied making that statement at trial; witness signed and adopted his statement to police at

---

[3] Aside from the general standard of review concerning evidentiary rulings, Appellant cites no law to support his first issue on appeal. ***See generally Commonwealth v. Johnson***, 604 Pa. 176, 985 A.2d 915 (2009), *cert. denied*, 562 U.S. 906, 131 S.Ct. 250, 178 L.Ed.2d 165 (2010) (explaining failure to provide discussion of claim with citation to relevant legal authority can constitute waiver of issue on appeal).

time it was taken and statement was verbatim contemporaneous recording of witness' oral answers; thus, witness' statement to police was admissible as prior inconsistent statement to impeach his credibility and as substantive evidence of matters asserted; detective took statement from witness, so detective could testify to answers witness had given, based upon detective's personal knowledge; **(4)**[4] search warrant and supporting affidavit of probable cause described place and person to be searched with sufficient particularity; affiant described item to be searched and seized as "Facebook account of [Appellant]: AKA Whiteboi Riq," provided Appellant's date of birth, and listed as description of premises to be searched, incoming and outgoing messages, photographs, video, locations, e-mail addresses, neoprint, wallposts, private messages, and headers; affidavit of probable

_____

[4] Preliminarily, the affidavit of probable cause describes Appellant's Facebook profile page as "non-blocked." In other words, the affidavit of probable cause (admitted as an exhibit at the suppression hearing) suggests Appellant did not use privacy settings and maintained a "public" Facebook account. Appellant did not dispute this statement in the affidavit of probable cause at the suppression hearing. Consequently, Appellant lacked a reasonable expectation of privacy in the content of his public Facebook profile page. *See generally Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, ___ (1967) (explaining: "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection"); *U.S. v. Meregildo*, 883 F.Supp.2d 523, 525 (S.D.N.Y. 2012) (citing *Katz* and stating: "When a social media user disseminates his postings and information to the public, they are not protected by the Fourth Amendment"; defendant had no justifiable expectation that his Facebook "friends" would keep his profile private; defendant's legitimate expectation of privacy ended when he disseminated posts to his "friends" because those "friends" were free to use information however they wanted).

cause included relevant Facebook URL; affidavit confirmed police had probable cause to search Appellant's Facebook profile based on belief that shooter in video was Appellant and when police viewed Appellant's Facebook profile picture, his profile picture showed Appellant's unique hairstyle at time of murder; Facebook (owner of property to be searched) was readily ascertainable from search warrant and affidavit of probable cause; moreover, even if Commonwealth committed technical error by not listing location of Facebook's custodian of records in search warrant, error did not warrant suppression; **(5)** Commonwealth presented two witness statements indicating witnesses saw Appellant shoot Victim and flee scene; Commonwealth introduced video evidence which showed man fitting Appellant's description shooting another man at same time and place of Victim's murder and then fleeing scene; expert witness testified Appellant fired deadly weapon multiple times at vital areas of Victim's body; thus, jury could infer Appellant had specific intent to kill to satisfy first-degree murder conviction[5]).[6]  Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

---

[5] To the extent Appellant challenges the weight of the evidence, the court properly disposed of that claim as well.  (**See** Trial Court Opinion at 32-33.)

[6] The correct citation for **Commonwealth v. Brewer** is 876 A.2d 1029, 1032 (Pa.Super. 2005), *appeal denied*, 585 Pa. 685, 887 A.2d 1239 (2005).

J-A03035-16

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/8/2016

- 6 -

# IN THE COURT OF COMMON PLEAS
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### CRIMINAL TRIAL DIVISION

| | | |
|---|---|---|
| **COMMONWEALTH** | : | **CP-51-CR-0000679-2013** |
| | : | |
| **vs.** | FILED : | |
| | JUN 2 2015 : | |
| | Criminal Appeals Unit | **SUPERIOR COURT** |
| **TARIQ JENKINS** | First Judicial District of PA : | **229 EDA 2015** |

**BRINKLEY, J.**                                               **JUNE 2, 2015**

## OPINION

Defendant Tariq Jenkins appeared before this Court for a jury trial and was convicted of first-degree murder, violations of the Uniform Firearms Act (VUFA) 6106 and 6108, and possession of an instrument of crime (PIC). This Court sentenced Defendant to a mandatory sentence of life without any possibility of parole on the first-degree murder charge and 2½ to 5 years state incarceration on the VUFA 6106 charge, to run consecutive to the sentence on the first-degree murder charge. This Court imposed no further penalty on the VUFA 6108 and PIC charges. Defendant appealed this judgment of sentence to the Superior Court and raised the following issues on appeal: (1) Whether this Court erred when it allowed evidence that a witness had seen the handle of a gun on Defendant's person earlier on the date of the murder; (2) Whether this Court improperly admitted hearsay into evidence; (3) whether this Court erred when it allowed a detective to read a witness's written statement as a prior inconsistent statement; (4) whether this Court erred when it denied Defendant's motion to suppress evidence

1

claiming that the search warrant was defective; (5) whether this Court erred when it denied Defendant's motion to suppress an eyewitness identification; (6) whether the evidence was sufficient to find Defendant guilty of first-degree murder; and (7) whether the verdict was against the weight of the evidence.

## PROCEDURAL HISTORY

On August 1, 2012, Defendant was arrested and charged with first-degree murder, VUFA 6106 and 6108, and PIC. From August 5 to August 8, 2014, a trial was held in the presence of a jury. On August 12, 2014, Defendant was found guilty of all charges. On that same day, this Court sentenced him to a mandatory sentence of life without any possibility of parole on the first-degree murder charge and to 2½ to 5 years state incarceration on the VUFA 6106 charge, to run consecutive to the sentence on the first-degree murder charge. This Court imposed no further penalty on the VUFA 6108 and PIC charges. On August 22, 2014, Defendant, through counsel, filed a post-sentence motion for a new trial. On December 23, 2014, Defendant's post-sentence motion was denied by operation of law. On January 10, 2015, Defendant filed a Notice of Appeal to the Superior Court. On March 26, 2015, upon receiving all the notes of testimony, this Court ordered Defendant to file a Concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(b). On April 15, 2014, defense counsel filed the Concise Statement of Errors.

## FACTS

Trial began in this matter on August 5, 2014. Defendant was represented at trial by Walter Chisholm, Esquire, while the Commonwealth attorney was Kirk Handrich, Esquire. The Commonwealth called Leonard Thompson ("Thompson") as its first witness. Thompson testified that, in the early morning hours of June 16, 2012, he was at 15th and Federal looking for

a friend of his named Tanya Love ("Love") and was heading towards Arianna Grocery on the corner of 15th and Federal when a man was shot. Thompson testified that, just prior to the shooting, he walked past two males who were travelling side-by-side towards him. Thompson further testified that one of the males was riding a bike while the other male was wearing a light blue hooded sweatshirt. Thompson identified Defendant as the man wearing the sweatshirt. (N.T. 8/5/2014 p. 88-92).

Thompson testified that, as he was about to turn onto Federal Street, he looked back towards the two men and saw Defendant pull out a gun and shoot the other man. Thompson further testified that he saw sparks come from the gun and he heard it fire four or five times. Thompson stated that he ran around the corner after he saw the man who was shot get off of his bike. Thompson testified that, a short time later, Defendant turned the same corner and ran past him towards 16th Street. Thompson stated that he went to Sydenham Street to drink the beer he was carrying and afterwards he returned to 15th Street, where he saw the decedent's body lying on the sidewalk across the street from where he was shot. Thompson testified that police officers had not arrived on the scene at the time and they did not arrive until 15-20 minutes later. Thompson stated that he did not talk to any of the police officers at the scene because he was afraid that people would see him talking to the police. Id. at 93-97.

Thompson testified that the police came to talk to him about the shooting a few days later. Thompson testified that he was standing at 15th Street when the officers pulled up and asked him if he was wearing a hooded sweatshirt and carrying a black bag on the night of the murder. Thompson stated that he knew that the police must have therefore seen him on one of the security cameras and he went with them to the Homicide Unit at 8th and Race. Thompson testified that he gave a formal statement to the police but he was not shown any photographs at

3

that time. Thompson testified that he described the shooter as light-skinned, around 5'10"-5'11", slim, and that he was wearing a blue hooded sweatshirt at the time of the shooting. Thompson further testified that he told the police that he would recognize the shooter if he saw him. Id. at 97-100.

Thompson testified that the gun that Defendant used was black but he did not know what type of gun it was. Thompson stated that the flash he earlier described seeing came from the muzzle of the gun. The Commonwealth played a compilation video prepared from security camera footage in the area. Thompson testified that he recognized himself, the decedent and Defendant in the video. Thompson stated that he returned to the Homicide Unit five days after his first interview and was shown photographs at that time. Thompson testified that he was shown an array of eight photographs by the police and was asked if he recognized anyone who was involved in the shooting. Thompson further testified that he identified Defendant in the array and signed his name above Defendant's photograph. Thompson stated that he had drunk three 24-ounce beers between 7 p.m. and 10 p.m. on the night of the murder, and had just bought a fourth beer at around 2 a.m., but he did not feel impaired by the alcohol. Thompson testified that the fourth beer was unopened when the shooting occurred. Id. at 102-04, 109-15.

The Commonwealth called Love as its next witness. Love testified that she had been getting high on crack cocaine with some friends on June 16, 2012 when they ran out of drugs. Love testified she and a friend named Clyde went to a phone booth at 15th and Federal to arrange to buy more drugs and that, when the two of them were at 16th and Federal, she heard around five or six gunshots. Love stated that, after they heard the gunshots, they returned to Clyde's house on Mole Street and she left roughly three hours later. (N.T. 8/6/2014 p.4-9).

4

Love testified that, after she left Clyde's house, she ran into a male she knew as "Light" on the corner of 16th and Wharton. Love testified that Light asked her if she could pick up the sweatshirt that he had left in the area of 16th Street. Love testified that she had known Light for roughly two to three years and he was often on the corner of 16th and Manton. Love testified that Defendant looked like Light but she was not sure if it was him. Love testified that, a couple of days after the shooting, the police picked her up and took her to the Homicide Unit, where she told the police what had happened and they showed her pictures. Love stated that she was known in her neighborhood as "Walk-A-Lot" because she was constantly walking around the neighborhood and that she knew most of the people who lived and worked in the neighborhood. Id. at 9-16.

Love testified that she went to the corner of 16th and Federal and found a light blue hooded sweatshirt on the ground near the corner, which she picked up and returned to Light, who said to her, "Thank you. I got you tomorrow." Love testified that she told the police that she had bought drugs from Light in the past and that she called him Light because he had light skin and she did not know his real name. Love testified that she was shown an array of 106 photos, with 8 photos per page and that she identified a photograph of Light on the eighth page of the array. Id. at 22-24, 30-34.

The Commonwealth played the compilation video for Love and she testified that the blue hooded sweatshirt she saw in the video was the one she picked up for Light. Love further testified that she identified the man wearing the sweatshirt in the video as Light when the police showed her the video. Love stated that she told the police that she had not seen Light in the neighborhood after the shooting happened. Love testified that she told the police that she did not know the decedent, Cornelius Riggs ("Riggs"), but she had purchased drugs from him before and

5

he would deliver drugs by bicycle if phoned. Love further testified that she told the police that Light sold crack cocaine in the area of 16th and Wharton. Love stated that she had been treated fairly when she was taken to the homicide unit and no one forced her to say anything or put words into her mouth. The Commonwealth played another video clip and Love testified that she recognized herself picking up the hooded sweatshirt near the corner of 16th and Federal in the video. Love testified that Light had tattoos on either side of his neck. Id. at 35-61.

The Commonwealth called Officer Chris Lai ("Lai") as its next witness. Lai testified that he had worked as a police officer in the 17th District since June 2002. Lai testified that he did not work on June 16, 2012 and learned that Riggs was shot the following day. Lai further testified that, upon learning that Riggs had been killed, he contacted the Homicide Unit and told the assigned detective to contact him once they had obtained the video footage from the area. Lai testified that he was contacted a few days later by Detective Robert Hesser ("Hesser") and subsequently stopped by the Homicide Unit after his shift ended on June 21, 2012 to view the footage, which was obtained from a beer store located at 15th and Federal, from Arianna Grocery across the street on 15th and Federal, and from Abreu Deli at 16th and Manton. Lai testified that he recognized Thompson walking westbound on Federal Street in one of the videos, although he did not know Thompson's name at the time. Lai further testified that he recognized Defendant wearing a light-blue hooded Hollister sweatshirt in the video from Arianna Grocery. Lai testified that Defendant later appeared on the video taken from Abreu Deli, at which time he was wearing a white t-shirt and was no longer wearing the blue hooded sweatshirt. Lai stated that he told Hesser that he was 90% sure that it was Defendant in the video, as Defendant had the same hairstyle. Lai testified that at the time Defendant wore his hair in short braids or "twisties". Id. at 89-100.

6

Lai testified that he had known Defendant for about three years by the time of the shooting and that Defendant was often in the area of 19th and Tasker and 16th and Manton. Lai testified that, during his first shift after viewing the video, he saw Thompson walking around 15th and Federal and subsequently took him to the Homicide Unit. Lai stated that he knew Love and would see her almost every day in the area around 15th and Federal. Lai further stated that Love had been in the neighborhood ever since he had started as a police officer and she knew him by name. Id. at 101-04.

Lai testified that he remained in contact with Hesser about the status of the investigation and, roughly a week or two after the 21st, Hesser let him know that the Homicide Unit was looking for Defendant, but Lai did not see Defendant anytime after the 21st. Lai further testified that he later became aware of a Facebook account listed under the name "Whiteboi Riq" which had public photos uploaded to the account with Defendant in all of the pictures. Lai stated that the photographs showed the hairstyle that Defendant wore in the summer of 2012. Lai testified that he informed the Homicide Unit about the Facebook page and secured a search warrant for it. Lai testified that the profile picture on the main page, which showed how Defendant wore his hair at the time of the shooting, was uploaded on May 20, 2012. Lai further testified that, in a subsequent photograph of Defendant taken August 1, 2012, he had cut his hair very short. Id. at 105-14.

The Commonwealth called Detective James Dunlap ("Dunlap") as its next witness. Dunlap testified that he had been a detective in the Homicide Unit since 2007 and had been a Philadelphia Police Officer since 1991. Dunlap testified that he worked with the Digital Imaging Video Response Team. Dunlap further testified that, from 2007 to 2012, he had received training from the FBI's Audio Visual Unit in Quantico, Virginia as well as from the Law Enforcement

Video Association of Indianapolis University and had taught police departments from other cities how to obtain video from security cameras. Dunlap stated that he was trained to access private security cameras and secure the footage so it could be presented in court. Dunlap stated that he had recovered video footage from over 500 scenes and locations, and had testified in state and federal court as an expert in forensic video recovery. Dunlap was subsequently offered and accepted by the Court as an expert in the field of forensic video recovery. Id. at 150-55.

Dunlap testified that he went to the scene at around 10 a.m. on June 16, 2012 to obtain video from Federal Beer, Federal Deli, and Arianna Grocery. Dunlap further testified that he was familiar with the area and with the video recorders used by those businesses. Dunlap testified that Arianna Grocery had two exterior cameras with the first camera facing northbound towards 15th Street which showed the front of the property and a second camera under the canopy of the store facing westbound down Federal Street. Dunlap stated that the shooting occurred almost entirely within view of these cameras. Dunlap testified that Federal Beer had one exterior camera which faced southbound on 15th Street and that he used the footage from Arianna Grocery and Federal Beer in the compilation video. Dunlap testified that he later retrieved footage from Rosario Pizza on the corner of 15th and Wharton, Abreu Deli from the corner of 16th and Manton, and from a rotating police camera located on the corner of 16th and Latona which was able to zoom in on the intersection of 16th and Federal. Id. at 157-63.

The Commonwealth played the compilation video for Dunlap. Dunlap testified that the video began with footage obtained from Arianna Grocery. Dunlap testified that this segment showed an individual come up Federal Street from 16th Street and head southbound on 15th Street in the company of a second male. Dunlap further testified that the compilation switched to footage obtained from Federal Beer which showed the individual come into view across the

8

street. Dunlap testified that the video switched back to footage from Arianna Grocery which showed a gun flash and an individual run westbound on Federal towards 16th Street. Dunlap further testified that this occurred at 2:02:46 a.m. and the first call regarding Riggs' murder was received by the police at 2:02:58 a.m. Id. at 165-72.

Dunlap testified that the next clip in the video came from the rotating pole camera at 16th and Latona. Dunlap stated that the video showed the corner of 16th and Federal and showed an individual turn the corner from 15th and Federal and run in the direction of the camera 24 seconds after the muzzle flash seen in the previous clip. Dunlap testified that the compilation switched to footage obtained from Abreu Deli, which showed an individual heading southbound on 16th Street from Federal Street. Dunlap further testified that he obtained footage from the camera at 16th and Latona which showed, at 4:42:20 a.m., a person pick up a sweatshirt from the same area that the individual was seen earlier. Id. at 172-77.

The Commonwealth called Dr. Marlin Osbourne ("Osbourne") as its next witness. Osbourne testified that he worked as an associate medical examiner for the Philadelphia Medical Examiners Office and had done so for nearly five years. Osbourne testified that he went to medical school and completed a four-year residency program at Hahnemann University Hospital followed by a one-year fellowship in forensic pathology with the Miami Dade Medical Examiners Office. Osbourne testified that he had performed approximately 1700 autopsies in Philadelphia and Miami and had testified as an expert in the field of forensic pathology over 50 times. Osbourne was offered and accepted by the Court as an expert in the field of forensic pathology. Id. at 182-88.

Osbourne testified that he performed Riggs' autopsy. Osbourne stated that Riggs was pronounced dead at 1204 South 15th Street by Medic Unit Number 37 on June 16, 2012 at 2:19

9

a.m. Osbourne testified that Riggs had gunshot wounds to his chest, right hip, back, right arm, and right hand. Osbourne testified that the gunshot wound to the chest was 33.5 centimeters below the top of his head and eight centimeters to the right of midline. Osbourne further testified that the bullet fractured the second and third ribs, entered the right pleural cavity and upper lobe of the right lung before penetrating the aorta and left ventricle and ultimately perforating the lower left lung. Osbourne testified that the bullet was recovered from the left side of Riggs' back. Osbourne stated the hemorrhages from this wound resulted in one liter of blood in the right pleural cavity, 650 milliliters of blood in the left pleural cavity and 150 milliliters of blood in the pericardial sac. Id. at 188-93.

Osbourne testified that Riggs would have experienced massive blood loss as a result of this wound and that, because the blood accumulated in and around his lungs, his lungs would have collapsed. Furthermore, because his lungs would have collapsed, there would have been no blood or oxygen going to his brain and this would have caused his death. Osbourne further testified that the massive blood loss likewise would have caused his death. Osbourne testified that Riggs' behavior immediately after he was shot was consistent with the internal injuries he described. Id. at 194-96.

Osbourne testified that Riggs also sustained a penetrating gunshot wound to the right hip. Osbourne testified that the bullet passed through the right iliopsoas muscle and entered the pelvic cavity before perforating the left common iliac artery and left iliopsoas muscle. Osbourne stated that the bullet was recovered from Riggs' left quadriceps muscle. Osbourne testified that, due to the damage caused to the iliac artery, Riggs would have suffered additional blood loss that would have compounded the blood loss in his chest. Osbourne testified that there was a perforating gunshot wound to Riggs' lower back which passed through the soft tissues of the back and exited

10

near where it entered. Osbourne further testified that Riggs also suffered a perforating gunshot wound to the right arm which passed through his biceps muscle and a perforating gunshot wound to the right hand which fractured his metacarpals before exiting through the palm. Osbourne stated that Riggs did not have any other injuries or conditions that would have contributed to his death. Osbourne testified that Riggs had Alprazolam, Oxycodone and Ethanol in his system at the time of his death, although none of these substances contributed to his death. Id. at 197-201.

The Commonwealth called Officer Brian Stark ("Stark") as its next witness. Stark testified that he had been a police officer for 24 years and had been assigned to the Crime Scene Unit for 14 years. Stark testified that he arrived to the crime scene at 3:10 a.m. and met with two detectives from the homicide unit. Stark testified that the police found fired cartridge casings prior to when he arrived on the scene and circled them. Stark further testified that the victim was on the opposite side of 15th Street from where the physical evidence was located. Stark stated that the firearms-related evidence was packaged and transported back to the Crime Scene Unit to be examined for fingerprints, while the blood samples that were collected at the scene were packaged and sent to the criminalistics laboratory for DNA analysis. Stark testified that the four fired cartridge casings were from two different manufacturers, but were all from .380-caliber automatic bullets. Stark testified that he tested the fired cartridge casings for fingerprints but found none. (N.T. 8/7/2014 p. 4-16, 34-39).

The Commonwealth called Officer Norman DeFields ("DeFields") as its next witness. DeFields testified that he had been assigned to the Firearms Identification Unit since 2008 and had been a police officer for 24 years. DeFields stated that he participated in a two-year in-house program that followed Association for Firearms and Tool Mark Examiners Guidelines and involved a 50-gun case analysis, over 1000 comparisons, visits to the ATF, FBI and State Police

11

laboratories, several written and oral tests, and a Brundage ten-barrel test. DeFields testified he personally handled between two to three hundred cases a year and that he had testified as an expert in the field of ballistics and firearm identification in state and federal court in Philadelphia. DeFields was offered and accepted by the Court as an expert in the field of ballistics and firearm identification. Id. at 46-51, 54.

DeFields testified that the four fired cartridge casings recovered by Stark were fired from the same gun. DeFields testified that the bullets recovered by Stark were copper-alloy jacketed expanding type .380 caliber bullets. The Commonwealth played the compilation video and DeFields testified that the flash seen in the video was consistent with the flash that would be seen when a .380 caliber handgun was fired at night. DeFields testified that he was not able to match the bullets to the fired cartridge casings, but they were all consistent with having been fired from a .380 automatic firearm. Id. at 57, 67-67, 77.

The Commonwealth called Christian Jones ("Jones") as its next witness. Jones testified that he lived in the neighborhood of 15th and Wharton and was friends with Riggs and knew Defendant. Jones stated that he was at 15th and Manton when Riggs was killed and that he saw Riggs ride past him down 15th Street before he heard the shots. Jones testified that he spoke with homicide a year after Riggs was shot, on June 16, 2013, and that he was truthful with the homicide detectives. Jones further testified that he signed each page of the statement the detectives took from him. Id. at 82-92.

Jones then testified at trial that he did not remember telling the police that he had information about the murder but he decided to talk about the murder because Hesser had asked him about it. The Commonwealth read from Jones' statement to homicide detectives. In response to the question, "Would you tell us what you observed on 6/16/12?" Jones answered, "I

12

was sitting down talking to some friends near 15th and Manton. Shots rang off. I walked to the corner of 15th Street and I see a guy I know as "Whiteboi" shooting a gun." Jones then testified at trial that he told the police the first part of the answer but did not tell them that he had seen "Whiteboi" shooting a gun. In response to the question, "Did you see who Whiteboi was shooting at?" Jones answered "Yes, [Riggs]". Jones testified at trial that he did not recall giving the police that answer. In response to the question, "Do you know Whiteboi's name" Jones answered "Just his first name, Tariq." Jones testified at trial that he did not know Whiteboi's name. In response to the question, "How long have you known Whiteboi?" Jones answered "About four or five years." Jones testified at trial that he gave that answer to police. Id. at 94-99.

In response to the question, "How many gunshots did you hear?" Jones answered "I heard several gunshots and jumped up and went to the corner and [saw] Whiteboi shoot several more times." In response to the question, "What happened next?" Jones answered "Whiteboi ran off towards Federal Street and went on Federal Street towards 16th Street." Jones testified at trial that he did not recall giving either of those answers. In response to the question, "Have you seen Whiteboi with a gun before?" Jones answered "I saw Whiteboi with a gun earlier that day." At trial, Jones testified that he had never seen Whiteboi with a gun because he was never around guns, despite being on probation for gun-related charges. In response to the question, "Could you describe the gun Whiteboi had earlier in the day?" Jones answered "I just seen the handle when he lifted his shirt." At trial, Jones testified that he did not give that answer to the police. In response to the question, "Do you know if there was any problems between [Riggs] and Whiteboi?" Jones answered, "Earlier in the day some guys were saying to Whiteboi, "How you let [Riggs] pull a gun on you and you don't do anything about it?" They walked off and like an hour later Whiteboi came back and said to me, "I am not playing no more"' and he lifted his shirt

13

and I saw the handle of a gun." At trial, Jones testified that he did not recall giving that answer to the police and had only told the police that he knew Whiteboi and Riggs were arguing about something. In response to the question, "About how long was this before Whiteboi shot [Riggs]?" Jones answered, "That was way earlier in the day like noontime." Jones testified at trial that he did not give that answer and that he was at work during that day. Id. at 100-07.

In response to the question, "Did you see Whiteboi after the shooting?" Jones answered "No, I never seen him after the shooting." Jones testified at trial that he did not give this answer to the police but he had not seen Defendant since the shooting. Jones testified that the police showed him a photograph of Riggs and he identified him and signed his name above the photograph. Jones further testified that the police showed him a photograph of Defendant and he signed the photograph and identified Defendant as Whiteboi. In response to the question, "Is this the same Whiteboi you have known four, five years and seen shoot [Riggs]?" Jones answered "Yes, I grew up with these dudes." At trial, Jones testified that he did not give that answer to the police. Jones further testified that he signed the statement because he believed he was signing papers for child support. Id. at 107-09.

Jones testified that he was very upset at the hearing this Court held for him a week earlier because he had recently lost his job. Jones testified that he did not remember saying at that hearing, "I am not going to testify. I am not going to testify." Jones further testified that he did not remember saying, "They're going to kill me in there" and stated that he was not afraid of anyone in prison. Jones stated that he did not know if people from his neighborhood knew that he had given a statement to the police, but he recognized Lou Meyers ("Meyers") in the courtroom and he did not know a person named Christopher Thomas ("Thomas"). Jones testified that, when Lai and Officer Marc Palazzi ("Palazzi") served him with a subpoena for

14

court on July 22, he did not ask the police to drive him somewhere else to take the subpoena but they did so on their own accord. Jones testified that he remembered telling this Court that he had not shown up in court because he had lost the subpoena after he had hid it so no one would see he was a witness in a homicide case. Id. at 110-15.

The Commonwealth called Detective Omar Jenkins ("Jenkins") as its next witness. Jenkins testified that he had worked for the Homicide Unit for approximately six years and had been a police officer for nineteen years. Jenkins testified that he and Detective Charles Grebloski ("Grebloski") took the statement from Jones on June 16, 2013. Jenkins testified that he was not involved in the investigation, but he was asked by Hesser to join Grebloski and speak with Jones. Jenkins testified that Jones did not seem upset about anything, that he was forthcoming and was not evasive. Jenkins stated that the interview took place at a desktop computer and that the questions which were asked and answered were typed verbatim. Id. at 120-22.

Jenkins testified that Jones signed and dated each page of his statement upon completion of the interview. Jenkins stated that he printed a copy of the statement and gave it to Jones to review. Jenkins testified that Jones read the statement and did not express, or appear to have, any difficulties reading the statement. Jenkins testified that Jones never requested to make any changes to the statement but said that everything was fine. Jenkins stated that the interview was relatively quick and Jones was forthcoming with the information. Jenkins testified that Jones signed photographs of Riggs and "Whiteboi" and identified Defendant as Whiteboi. Jenkins further testified that Jones signed a statement of adoption attestation. Jenkins stated that he had no further participation in the investigation beyond taking the interview. Id. at 129-37.

15

The Commonwealth called Palazzi as its next witness. Palazzi testified that he was assigned to the 17th District in South Philadelphia. Palazzi testified that he and Lai served Jones with a subpoena to appear in court on July 29, 2014. Palazzi testified that they found Jones in front of his residence in the 1200 block of South 15th Street and waited until he left his house so they wouldn't have to serve him in front of his friends and family. Palazzi stated that they approached Jones on Federal Street and he got into their car willingly. Palazzi testified that they drove to Broad Street, where Jones signed the subpoena, and then dropped him off at 13th and Federal. Palazzi stated that Jones did not wish to be dropped off at 15th and Federal where people might see him. Id. at 148-50.

Palazzi testified that he explained to Jones that he had to appear in Courtroom 907 at 9:00 a.m. on July 29, 2014 and that Jones did not appear to be confused by what Palazzi told him. Palazzi testified that Jones did not appear in court on the 29th and this Court issued a bench warrant for him on that day. Palazzi further testified that he found Jones that night in front of his residence and Jones told him that he went to Courtroom 909, where he was told that he did not need to be there and subsequently left. Palazzi stated that there is no Courtroom 909 at the Criminal Justice Center. Palazzi testified that this Court held a hearing for Jones on July 30 and decided to hold him in custody as a material witness until trial. Palazzi further testified that Jones became visibly upset, started crying and stated, "I can't go to jail. They will kill me...Fuck it. Put me in jail. When I come here next week, I am not saying shit anyway." Id. at 151-56.

The Commonwealth recalled Lai as a witness. Lai testified that he knew Jones, that he served him with the subpoena for this case and subsequently arrested him after he failed to appear in court. Lai stated that he was aware that Jones was testifying in court on that day and that he had seen all of the people who had been to the courtroom during the trial. Lai testified

16

that, prior to Jones testifying, he recognized Meyers and Thomas sitting outside the courtroom. Lai further testified that Meyers and Thomas left the courtroom shortly before Jenkins came in to testify. Lai stated Meyers and Thomas had not been there the rest of the week and were therefore only present when Jones testified. Lai testified that Meyers was friends with Jones and that Thomas frequented the area of 17th and Manton. Id. at 166-70.

The Commonwealth played the compilation video for Lai. Lai testified that he recognized Thompson from the video obtained from Arianna Grocery and that he recognized Defendant in the clip obtained from Abreu Grocery. Lai further testified that there was a person in the footage obtained from Arianna Grocery who wore the same sweatshirt as Defendant was seen wearing in the footage from Abreu Grocery. Lai stated that Defendant had tattoos on either side of his neck, with a 'H' surrounded by flames on the right side and a 'B' surrounded by flames on the left side. Lai further stated that, based on the Facebook photos that he saw, Defendant had those same tattoos on his neck in 2012. Id. at 172-81.

The Commonwealth called Hesser as its next witness. Hesser testified that he had been assigned to the Homicide Unit for approximately nine years and had been with the police department since 1988. Hesser testified that he was the assigned detective on Riggs' murder. Hesser further testified that he went to the scene with Dunlap and they retrieved the videotapes from the businesses in the area. Hesser stated that Lai contacted him about the case later that day and subsequently, on June 21, 2012, watched the video that was obtained by Dunlap. Hesser testified that Lai indicated that he saw Defendant on the video and that Lai recognized Thompson although he did not know Thompson's name at the time. Id. at 182-88.

Hesser testified that, when he interviewed Thompson, Thompson gave him the following description of the shooter, "A male, a shade lighter than me, so I would call that light brown

17

skin. He looked to be like 5'10", 5'11", slender build, between 20 and 30 years old but he didn't look young. I would recognize his face if I seen him again. He was wearing a light blue hoody and jeans." Hesser testified that he did not show Thompson a photo array at that time because he wanted to investigate further. Hesser stated that Thompson was cooperative and he directed him to Love, with whom he spoke a few days later. Hesser further testified that Love told him she retrieved a hooded sweatshirt for a male she knew as Light and that he subsequently retrieved video footage from the pole camera operated by the Police Department which showed an individual retrieving a hooded sweatshirt in the area. Id. at 189-93.

Hesser testified that he had Love view a photo array which, based on the parameters entered, returned 106 matches with each page displaying eight photographs. Hesser stated that Love went through the pages one at a time until she got to page eight, at which point she stood from her seat, pointed at a photograph of Defendant and said "that is him." Hesser stated that Love had an immediate reaction to the photograph and there was no hesitation on her part. Hesser testified that Thompson was later brought in for a photo array consisting of a page with eight photographs of persons of the same race, gender, approximate age and features. Id. at 193-96.

Hesser testified that an arrest warrant was prepared for Defendant's arrest on June 29, 2012 by Detective Pitts and that Defendant was arrested on August 1, 2012. Hesser testified that, on June 15, 2013, he was made aware that Jones was brought into the Homicide Unit on an unrelated matter. Hesser further testified that he introduced himself to Jones, asked if he had any information about Riggs' murder and Jones indicated that he did. Hesser testified that there was nothing remarkable about Jones's demeanor and that no one at the Homicide Unit yelled at

18

Jones, called him a liar or behaved in a manner that could have been construed by Jones that way. Id. at 197-201.

The Commonwealth read a stipulation, by and between counsel, that the Philadelphia Police responded to the area of 15th and Federal around 2:05 a.m. on June 16, 2012 and secured the crime scene. The Officer of the Medical Examiner sent out an investigator to the scene who identified the decedent as Riggs. The police recovered a broken watch, a set of keys, $543, and a cell phone in the area around Riggs' body and on his person. (N.T. 8/8/2014 p. 4-5).

The Commonwealth read a second stipulation, by and between counsel, that after preparation of Defendant's arrest warrant, the police went to 1610 South 19th Street, Defendant's last known address, on June 30, 2012 to execute the warrant. but Defendant was not present. That same day, the police went to a second address, 2024 Mifflin Street, which was a vacant property. Detectives prepared a fugitive packet, including wanted posters for Defendant, which was sent to all divisions in the city and to the FBI Fugitive Task Force. On July 27, 2012, detectives went to 1730 South 19th Street, which was an address Defendant listed to receive benefits, but there was no response. That same day, they went to 1605 South 28th Street and 3901 Conshohocken Avenue. On August 1, 2012, at 10:30 p.m., detectives were contacted by Lee Mandel, Esquire, who stated that he wanted to turn over Defendant on the strength of the arrest warrant. The detectives went to the Criminal Justice Center and took custody of Defendant, who was placed under arrest and transported to the Homicide Unit. Id. at 5-7.

The Commonwealth moved a certificate of non-licensure for Defendant into evidence. The certificate showed that the State Police of Pennsylvania had checked their database of everyone in Pennsylvania who had a valid license to carry a concealed firearm or to carry a firearm for sportsman purposes and found that Defendant did not have a valid license for either

19

on the date of the shooting. Id. at 7-8. After the Commonwealth moved the certificate into

evidence, the Commonwealth and the defense rested. Id. at 9, 33.

## ISSUES

I.   **WHETHER THIS COURT ERRED WHEN IT ALLOWED EVIDENCE THAT A WITNESS HAD SEEN THE HANDLE OF A GUN ON DEFENDANT'S PERSON EARLIER ON THE DATE OF THE MURDER.**

II.  **WHETHER THIS COURT IMPROPERLY ADMITTED HEARSAY INTO EVIDENCE.**

III. **WHETHER THIS COURT ERRED WHEN IT ALLOWED A DETECTIVE TO READ A WITNESS'S WRITTEN STATEMENT AS A PRIOR INCONSISTENT STATEMENT.**

IV.  **WHETHER THIS COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION TO SUPPRESS CLAIMING THAT THE SEARCH WARRANT WAS DEFECTIVE.**

V.   **WHETHER THIS COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION TO SUPPRESS A WITNESS IDENTIFICATION.**

VI.  **WHETHER THE EVIDENCE WAS SUFFICIENT TO FIND DEFENDANT GUILTY OF FIRST-DEGREE MURDER.**

VII. **WHETHER THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.**

## DISCUSSION

I.   **THIS COURT PROPERLY ALLOWED EVIDENCE THAT JONES HAD SEEN THE HANDLE OF A GUN ON DEFENDANT'S PERSON ON THE DATE OF THE MURDER.**

This Court properly allowed evidence that Jones had seen the handle of a gun on

Defendant's person earlier on the date of the murder. Generally, evidence is admissible if it is

relevant, that is, "if it logically tends to establish a material fact in the case, tends to make a fact

at issue more or less probable or supports a reasonable inference or presumption regarding a

material fact." Commonwealth v. Kinard, 2014 PA Super 41, 95 A.3d 279, 284 (2014) (quoting

20

Commonwealth v. Williams, 586 Pa. 553, 896 A.2d 523, 539 (2006)). Because all relevant Commonwealth evidence is meant to prejudice a defendant, exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case. Commonwealth v. Owens, 2007 PA Super 213, 929 A.2d 1187, 1191 (2007) (citing Commonwealth v. Broaster, 863 A.2d 588, 592 (Pa.Super. 2004)). A trial court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts form part of the history and natural development of the events and offenses with which a defendant is charged. Id.

The general rule is that where weapon evidence cannot be specifically linked to a crime, such evidence is not admissible. Owens, 929 A.2d at 1191 (citing Commonwealth v. Robinson, 554 Pa. 293, 721 A.2d 344, 351 (1998)). The exception to this general rule is where the accused had a weapon or implement suitable to the commission of the crime charged. This evidence is always a proper ingredient of the case for the prosecution. Id. (citing Robinson, 721 A.2d at 351). A weapon shown to have been in a defendant's possession may properly be admitted into evidence, even though it cannot positively be identified as the weapon used in the commission of a particular crime, if it tends to prove that the defendant had a weapon similar to the one used in the perpetration of the crime. Id. (citing Broaster, 863 A.2d at 592). Uncertainty whether the weapon evidence was actually used in the crime goes to the weight of such evidence, not its admissibility. Id. (citing Commonwealth v. Williams, 537 Pa. 1, 640 A.2d 1251, 1260 (1994)).

In the case at bar, Defendant sought to bar any evidence that Jones had told the police that he had seen the handle of a gun on Defendant's person earlier on the day of the murder. Defendant argued that the evidence was irrelevant, as there was no evidence presented that the handle belonged to the gun used in the murder. However, the evidence that Jones saw the handle

21

of a gun in Defendant's possession on the day of the murder was properly admissible, despite the fact that it could not be positively identified as the gun used in Riggs's murder, because it tended to prove that Defendant was in possession of weapon similar to the one used in the murder on the day of the murder. Any uncertainty about whether the handle Jones saw was that of the murder weapon went to the weight that the jury placed upon the evidence, not to its admissibility. Therefore, this Court properly allowed evidence that Jones had seen the handle of a gun on Defendant's person on the day of the murder.

## II.     THIS COURT DID NOT ADMIT HEARSAY INTO EVIDENCE.

This Court did not improperly admit hearsay into evidence. Under Pennsylvania Rules of Evidence 801 and 802, an out-of-court statement is inadmissible as hearsay if it is being offered to prove the truth of the matter asserted in the statement. Pa.R.E. 801, 802. Double hearsay is permissible if there is a hearsay exception for each statement in the chain. Commonwealth v. Ogrod, 576 Pa. 412, 839 A.2d 294, 326 n.23 (2003) (citing Commonwealth v. Chmiel, 558 Pa. 478, 738 A.2d 406, 417 (1999)). An out-of-court statement is not hearsay when it has a purpose other than to convince the fact finder of the truth of the statement. Commonwealth v. Busanet, 618 Pa. 1, 54 A.3d 35, 56 (2012). A statement is not hearsay when it is offered to show the effect on the listener. Id. Furthermore, Pennsylvania courts have upheld out-of-court statement as admissible to show the listener's state of mind, when the statement demonstrated the defendant's intent to kill the victim. See Commonwealth v. Levanduski, 2006 PA Super 204, 907 A.2d 3, 15-16 (2006) (citing Commonwealth v. Chandler, 554 Pa. 401, 721 A.2d 1040 (1998); Commonwealth v. Sneeringer, 447 Pa.Super. 241, 668 A.2d 1167 (1995); Commonwealth v. Stallworth, 566 Pa. 349, 781 A.2d 110 (2001)); See also Commonwealth v. Fisher, 545 Pa. 233, 681 A.2d 130, 140 (1996).

22

In the case at bar, Defendant filed a motion in limine to bar the portion of Jones's statement to police in which Jones overheard an unknown declarant say to Defendant, "How you let [Riggs] pull a gun on you and you don't do anything about it." Defendant argued that the statement was inadmissible hearsay because there was a lack of information to determine the context in which the statement was made and whether Defendant even heard the statement. The Commonwealth argued in response that the statement was admissible to show the state of mind of the listener, Defendant, and was not offered to prove the truth of the matter asserted therein. This Court denied Defendant's motion and stated that challenged portion of the statement was admissible because it was not offered for the truth of the matter but to show the effect upon Defendant and his state of mind. (N.T. 7/30/2014 p. 4-20).

This Court did not admit inadmissible hearsay when it allowed into evidence the portion of Jones's statement in which an unknown declarant said to Defendant "How you let [Riggs] pull a gun on you and you don't do anything about it". As the statement was not offered to prove the truth of the matter asserted therein, that Riggs had earlier pulled a gun on Defendant and Defendant did not respond, it was not inadmissible hearsay. Rather, the statement was properly admissible to show the effect on the listener and Defendant's state of mind at the time, especially when considered in connection with Defendant's response to the statement, in which he pulled up his shirt to reveal the handle of a gun and said "I'm not playing no more". Furthermore, after the Commonwealth read the challenged statement during Jones's testimony, this Court issued the following instruction, which was approved by defense counsel, to the jury,

> "Ladies and Gentlemen, you just heard evidence contained in the statement of Mr. Jones that refers to the following: "Earlier in the day some guys was saying to [Defendant], "How you let [Riggs] pull a gun on you and you don't do anything about it?" This evidence is offered for one purpose and one purpose only- to show the effect on the listener and, in this case, the Defendant and his state of mind at the

23

time."

(N.T. 8/7/2014 p. 105-06). Therefore, this Court properly allowed the statement to be introduced into evidence as it was not inadmissible hearsay but was admissible to show the effect on the listener and Defendant's state of mind at the time.

### III. THIS COURT DID NOT ERR WHEN IT ALLOWED JENKINS TO READ JONES'S STATEMENT TO THE POLICE AS A PRIOR INCONSISTENT STATEMENT.

This Court properly allowed Jenkins to read Jones's statement as a prior inconsistent statement. The general rule is that a prior inconsistent statement of a declarant is admissible to impeach the declarant. Commonwealth v. Henkel, 2007 PA Super 333, 938 A.2d 433, 443 (2007) (citing Commonwealth v. Brady, 510 Pa. 123, 507 A.2d 66, 68 (1986)). In Brady, the Supreme Court of Pennsylvania reconsidered the longstanding rule that prior inconsistent statements of a non-party witness could only be used to impeach the credibility of the witness, not as substantive evidence to prove the truth of the matters asserted therein. Commonwealth v. Buford, 2014 PA Super 224, 101 A.3d 1182, 1199 (2014) (citing Commonwealth v. Wilson, 550 Pa. 518, 707 A.2d 1114, 1115–1117 (1998)). Inconsistent statements made by a witness prior to the proceeding at which he is then testifying are admissible as substantive evidence of the matters they assert so long as those statements, when given, were adopted by the witness in a signed writing or were verbatim contemporaneous recordings of oral statements. Commonwealth v. Stays, 2013 PA Super 170, 70 A.3d 1256, 1261 (2013) (citing Commonwealth v. Presbury, 445 Pa.Super. 362, 665 A.2d 825, 831–32 (1995)). Significantly, it is not imperative that the defendant actually cross-examine the witness; if the defendant had an adequate opportunity to do so with full knowledge of the inconsistent statement, the mandate of Rule 803.1 is satisfied. Id. at 1262

24

In the case at bar, defense counsel objected when the Commonwealth asked Jenkins, who had taken the statement from Jones, to read from the statement. Defense counsel argued that the Commonwealth had already gone through the statement during Jones's testimony and that Jenkins could not testify to the prior inconsistent statements of another witness. The Commonwealth argued that the statement was admissible as a prior inconsistent statement as Jones had testified in court and Defendant had the opportunity to cross-examine him about the statement. This Court overruled the objection and stated that the evidence was admissible because Jones had denied portions of his statement while testifying and Jenkins had personal knowledge of the statement as he was present when it was taken.

This Court properly allowed Jenkins to read from Jones's statement to the police. The statement was admissible both to impeach the credibility of Jones and as substantive evidence of the matters asserted therein, as Jones had signed and adopted the statement when it was taken and it was a verbatim contemporaneous recording of Jones's oral answers. Far from being merely impeachment on a collateral matter, Jones's prior inconsistent statement was substantive evidence of direct importance to the case at hand. In his statement, Jones claimed that he personally witnessed Defendant shoot Riggs multiple times but at trial, Jones denied telling the police that he had seen Defendant shoot Riggs. As Jenkins had taken the statement from Jones, he could testify to the answers that Jones had given based upon his personal knowledge. Thus, this Court did not err when it allowed Jenkins to read Jones's prior inconsistent statement.

## IV. THIS COURT DID NOT ERR WHEN IT DENIED DEFENDANT'S MOTION TO SUPPRESS BASED ON A DEFECTIVE SEARCH WARRANT.

This Court did not err when it denied Defendant's motion to suppress evidence obtained from his Facebook profile based upon a defective search warrant. An error in a warrant is fatal

only if it deprives a reviewing court of the ability to review the propriety of the issuance and execution of the warrant. Commonwealth v. Benson, 2010 PA Super 234, 10 A.3d 1268, 1274 (2010) (citing Commonwealth v. Begley, 566 Pa. 239, 780 A.2d 605, 641 (2001)). Furthermore, the Pennsylvania Supreme Court has instructed that search warrants should "be read in a common sense fashion and should not be invalidated by hypertechnical interpretations. This may mean, for instance, that when an exact description of a particular item is not possible, a generic description will suffice." Commonwealth v. Orie, 2014 PA Super 44, 88 A.3d 983, 1003 (2014) (quoting Commonwealth v. Rega, 593 Pa. 659, 933 A.2d 997, 1012 (2007)). Pennsylvania law requires only that "[t]he place to be searched must be described precise[ly] enough to enable the executing officer to ascertain and identify, with reasonable effort, the place intended, and where probable cause exists to support the search of the area so designated, a warrant will not fail for lack of particularity." Commonwealth v. Johnson, 2011 PA Super 256, 33 A.3d 122, 125 (2011) (quoting Commonwealth v. Belenky, 777 A.2d 483, 486 (Pa.Super.2001)). This standard likewise applies to descriptions of persons contained in search warrants. Id.

In the case at bar, Defendant argued that the warrant used to search his Facebook profile was defective because it failed to list the custodian of records for Facebook, or anyone else, as the owner of the place to be searched and because it failed to describe with particularity the place to be searched. The Commonwealth argued in response that the warrant sought electronic data, which was qualitatively different from evidence obtained from a physical location, and that the warrant stated with the requisite level of particularity the account information that was sought. The Commonwealth noted that the warrant and supporting affidavit included Defendant's name, the URL of his Facebook account, his date of birth, location, and the specific items sought from his Facebook account. The Commonwealth further argued that, even if it was error to have failed

26

to list Facebook's custodian of records on the warrant, then that was mere technical error which did not rise to the level warranting suppression. This Court denied the motion to suppress and stated that the warrant contained sufficient particularity to identify Defendant's Facebook account and complied with Facebook's procedure for warrants listed on their website. (N.T. 7/30/2014 p. 20-37).

This Court properly denied Defendant's motion to suppress based upon failure of the search warrant to list the custodian of records for Facebook as the owner of the premises to be searched. Both the search warrant and supporting affidavit describe the place and person to be searched with enough particularity to enable the executing officer to identify both. In the search warrant, Lai, the affiant, described the item to be searched and seized as the "Facebook account of Tariq Jenkins: AKA Whiteboi Riq DOB 02/20/1989" and listed "incoming and outgoing messages, photographs, video, locations, email addresses, neoprint, wallposts, private messages and headers" as the description of the premises to be searched. In the affidavit of probable cause, Lai further described the place to be searched as Defendant's Facebook account, "https://www.facebook.com/#!/whiteboiriq ... Date of Birth, 02/20/1989; From Philadelphia, PA". Furthermore, the affidavit stated that probable cause existed to search Defendant's Facebook profile based on Lai's belief that the shooter in the surveillance video was Defendant and that, when Lai viewed Defendant's Facebook profile, he saw that it contained pictures of Defendant's hairstyle at the time of the murder. Thus, the warrant and supporting affidavit described the place and person to be searched with enough particularity to allow the executing officer to understand that Defendant's Facebook profile was to be searched for the described items, and that there was probable cause to search the profile for those items. Likewise, the owner of the property, Facebook, was readily ascertainable from the warrant and the affidavit.

27

Furthermore, even if it was error to not list Facebook's custodian of records as the owner of the premises, such error was technical and did not warrant suppression. Therefore, this Court did not err when it denied Defendant's motion to suppress based on a defective search warrant.

## V. THIS COURT DID NOT ERR WHEN IT DENIED DEFENDANT'S MOTION TO SUPPRESS IDENTIFICATION BY THOMPSON.

This Court did not err when it denied Defendant's motion to suppress Thompson's identification of him as the shooter. In determining whether a particular identification was reliable, the court should consider the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Commonwealth v. Valentine, 2014 PA Super 220, 101 A.3d 801, 806 (2014) (citing Commonwealth v. Bruce, 717 A.2d 1033, 1037 (Pa.Super.1998)). In reviewing the propriety of identification evidence, the central inquiry is whether, under the totality of the circumstances, the identification was reliable. Commonwealth v. Kearney, 2014 PA Super 97, 92 A.3d 51, 65 (2014) (citing Commonwealth v. Armstrong, 74 A.3d 228, 238 (Pa.Super.2013)). The courts will not suppress an identification based upon a challenge to the reliability of the identification alone; rather, the record must demonstrate suggestiveness. Commonwealth v. Patterson, 2007 PA Super 404, 940 A.2d 493, 503 (2007) (citing Commonwealth v. O'Bryant, 320 Pa.Super. 231, 467 A.2d 14, 16 (1983)).

In the case at bar, Defendant filed a pre-trial motion to suppress Thompson's identification of him as the shooter. Defendant argued that Thompson's identification of Defendant was unreliable as he only had a very limited period of time to view the shooter in night-time conditions and that Thompson had his back towards the shooter when the gun was fired. Defendant further argued that his motion for a lineup at the preliminary hearing was

28

wrongfully denied based upon misstatements of fact by the Commonwealth. The Commonwealth argued that there were no misstatements of fact made by the Commonwealth at the preliminary hearing and that there was no allegation of suggestiveness in the identification process. The Commonwealth further noted that Thompson's description of the shooter during his first statement matched Defendant's appearance. This Court denied the motion and stated that the judge at the preliminary hearing had not relied upon any representations made by the Commonwealth but had denied the motion based upon the testimony Thompson gave on the motion at the hearing. (N.T. 7/1/2014 p.16-42).

This Court properly denied Defendant's motion to suppress Thompson's identification. As the Commonwealth noted, there was no allegation, and the record did not demonstrate, that there was any suggestiveness in the identification process. Rather, Defendant challenged the identification based upon its reliability alone and therefore suppression was not warranted, especially as Thomspon's description of the shooter matched Defendant's appearance. Furthermore, the Commonwealth did not make any misrepresentations nor did the Court at the preliminary hearing rely upon any misrepresentations when it denied Defendant's motion for a lineup. To the contrary, the Commonwealth accurately stated that the interaction between Defendant and Thompson lasted for only a matter of seconds rather than minutes, Thompson testified and was cross-examined at the preliminary hearing and the Court subsequently denied the motion for a lineup based on the testimony it received from Thompson. As Defendant's motion to suppress identification was based solely upon the reliability of the identification, and the Court at the preliminary hearing did not wrongfully deny the motion for a lineup based upon any misrepresentations made by the Commonwealth, this Court properly denied Defendant's motion to suppress the identification made by Thompson.

29

## VI.    THE EVIDENCE WAS SUFFICIENT TO FIND DEFENDANT GUILTY OF FIRST-DEGREE MURDER.

The evidence presented at trial was sufficient to find Defendant guilty of first-degree murder. A review of the sufficiency of the evidence to support a conviction requires that the evidence be reviewed in the light most favorable to the Commonwealth as verdict winner. Commonwealth v. Levy, 2013 PA Super 331, 83 A.3d 457, 461 (2013) (quoting Commonwealth v. Williams, 871 A.2d 254, 259 (Pa.Super. 2005)). The Commonwealth is also entitled to all favorable inferences which may be drawn from the evidence. Commonwealth v. Kelly, 2013 PA Super 276, 78 A.3d 1136, 1139 (2013) (citing Commonwealth v. Hopkins, 67 A.3d 817, 820 (Pa.Super. 2013)). The evidence put forth by the Commonwealth will be considered sufficient if it establishes each material element of the crime beyond a reasonable doubt, even if by wholly circumstantial evidence. Commonwealth v. Franklin, 2013 PA Super 153, 69 A.3d 719, 722 (2013) (citing Commonwealth v. Brewer, 876 A.2d 1029, 1032 (2001)).

When determining whether the evidence is sufficient to support a guilty verdict, the appellate court must examine the entire trial record and consider all of the evidence actually received. Commonwealth v. Graham, 2013 PA Super 306, 81 A.3d 137, 142 (2013) (quoting Commonwealth v. Brown, 23 A.3d 544, 559-60 (Pa.Super 2011)). However, the trier of fact is entitled to believe all, part or none of the evidence received at trial and the appellate court cannot substitute its judgment for that of the fact-finder. Commonwealth v. Fabian, 2013 PA Super 6, 60 A.3d 146, 151 (2013) (quoting Commonwealth v. Jones, 886 A.2d 689, 704 (Pa.Super. 2005)). The facts and circumstances established by the Commonwealth need not eliminate any possibility of the defendant's innocence; rather, any doubt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact could be concluded. Commonwealth v. Stays, 2013 PA Super 170, 70 A.3d 1256, 1266 (2013)

30

(citing Commonwealth v. Aguado, 760 A.2d 1181, 1185 (Pa.Super. 2000)).

To obtain a conviction of first degree murder, the Commonwealth must prove that a human being was unlawfully killed, that the defendant perpetrated the killing, and that the defendant acted with malice and a specific intent to kill. Commonwealth v. Diamond, 623 Pa. 475, 83 A.3d 119, 126 (2013) (citing Commonwealth v. Kennedy, 598 Pa. 621, 959 A.2d 916, 920 (2008)). Specific intent to kill as well as malice can be inferred from the use of a deadly weapon upon a vital part of the victim's body. Commonwealth v. Padilla, 622 Pa. 449, 80 A.3d 1238, 1244 (2013) (citing Commonwealth v. Houser, 610 Pa. 264, 18 A.3d 1128, 1133-34 (2011)). The law does not require a lengthy period of premeditation; indeed, the design to kill can be formulated in a fraction of a second. Commonwealth v. Jordan, 619 Pa. 513, 65 A.3d 318, 323 (2013) (citing Commonwealth v. Rivera, 603 Pa. 340, 983 A.2d 1211, 1220 (2009)). Whether the accused had formed the specific intent to kill is a question of fact to be determined by the jury. Id. (citing Commonwealth v. Carroll, 412 Pa. 525, 194 A.2d 911, 916 (1963)).

In the case at bar, the evidence presented at trial was more than sufficient to find Defendant guilty of first-degree murder. Thompson testified that he witnessed Defendant shoot Riggs multiple times with a firearm and then flee the scene. The Commonwealth introduced Jones's statement to the police, in which Jones stated that he witnessed Defendant shoot Riggs multiple times and then flee in the direction of 16th and Federal. The Commonwealth also introduced a video, compiled from multiple private businesses and a rotating police camera in the area, which showed a man fitting Defendant's description shooting another man at the same time and place that Riggs was murdered and then run in the direction of 16th and Federal. Osbourne testified that Riggs had multiple gunshot wounds to his chest, back, hip, and right arm, and had sustained extensive damage to both lungs, his aorta and his left common iliac artery. The

31

evidence thus showed that Defendant fired a deadly weapon multiple times at vital areas of Riggs body and therefore the jury could infer that he had the specific intent to kill Riggs. Consequently, the evidence was sufficient to find Defendant guilty of first-degree murder.

### VII. THE VERDICT WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE.

The verdict in this case was not against the weight of the evidence presented at trial. Under Pennsylvania law, a weight of the evidence claim concedes that the evidence was sufficient to sustain the verdict. Commonwealth v. Lyons, 622 Pa. 91, 79 A.3d 1053, 1067 (2013) (citing Commonwealth v. Widmer, 560 Pa. 308, 744 A.2d 745, 751-52 (2000)). The weight of the evidence is "exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." Commonwealth v. Luster, 2013 PA Super 204, 71 A.3d 1029, 1049 (2013) (quoting Commonwealth v. Champney, 574 Pa. 435, 832 A.2d 403, 408 (2003)). In addition, "where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence...rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim." Commonwealth v. Collins, 2013 PA Super 158, 70 A.3d 1245, 1251 (2013) (quoting Champney, 832 A.2d at 408). A verdict is not contrary to the weight of the evidence because of a conflict in testimony or because the reviewing court on the same facts might have arrived at a different conclusion than the fact-finder. Commonwealth v. Morales, 91 A.3d 80, 91 (Pa. 2014) (quoting Commonwealth v. Tharp, 574 Pa. 202, 830 A.2d 519, 528 (2003)). Rather, a new trial is warranted only when the jury's verdict is so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. Id.

32

In the case at bar, the jury heard evidence that was consistent and credible from multiple witnesses which implicated Defendant in Riggs's murder. In his statement, Jones stated that he had known both Defendant and Riggs for multiple years and he saw Defendant shoot Riggs then run towards 16th and Federal. Thompson testified that he walked past Defendant and Riggs shortly before he witnessed Defendant shoot Riggs and run towards 16th and Federal. Thompson testified that Defendant was wearing a blue-hooded sweatshirt at the time. Lai testified that he was able to identify Thompson as he walked past Defendant and Riggs and that, upon his first viewing of the videos taken at the scene, he told Hesser he was ninety percent sure he recognized Defendant wearing a blue-hooded sweatshirt. Lai testified that Defendant appeared in another video taken shortly after the murder wearing a white t-shirt instead of the blue hooded sweatshirt. Love testified that a man she knew as "Light", and who she had previously identified as Defendant from a photo array containing 106 photos, asked her to retrieve his blue hooded sweatshirt from 16th and Federal a couple hours after the shooting. Love further testified that Light had distinctive tattoos on either side of his neck, and Lai testified that Defendant had an "H" and "B" on either side of his neck. Love, Jones and Lai each testified that they did not see Defendant in the neighborhood after the shooting. Lai further testified that he recognized Defendant in the video due to his distinctive braided hairstyle, but when Defendant was arrested he had cut his hair very short. Thus, the jury's verdict was not so contrary to the evidence presented at trial that it shocked one's sense of justice. Therefore, the verdict was not against the weight of the evidence.

33

## CONCLUSION

After a review of the applicable rules of evidence, statutes, case law and testimony, this Court committed no error. This Court did not err when it allowed evidence that Jones had seen the handle of a gun on Defendant's person on the day of the murder. This Court did not admit hearsay into evidence. This Court did not err when it allowed Jenkins to read Jones's statement as a prior inconsistent statement. This Court did not err when it denied Defendant's motion to suppress claiming that the search warrant was defective. This Court did not err when it denied Defendant's motion to suppress Thompson's identification of him as the shooter. The evidence was sufficient to find Defendant guilty of first-degree murder. The verdict was not against the weight of the evidence. Therefore, this Court's judgment of sentence should be upheld on appeal.

BY THE COURT:

_____
J.

34